UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

In re:                              §
                                    §
KOSMOS ENERGY LTD. SECURITIES       §    CONSOLIDATED CIVIL ACTION NO.
LITIGATION                          §    3:12-CV-373-B
                                    §

## MEMORANDUM OPINION AND ORDER

Before the Court are the Motions to Dismiss filed by Defendants on January 22, 2013 (docs. 73, 75, 76). For the reasons stated below, the Motions are **GRANTED IN PART** and **DENIED IN PART**. The Consolidated Complaint's § 12(a)(2) claim is **DISMISSED WITHOUT PREJUDICE** as to Kosmos Energy Ltd. ("Kosmos").[1] The Consolidated Complaint's § 15 claim is **DISMISSED WITHOUT PREJUDICE** as to The Blackstone Group L.P. ("Blackstone") and Warburg Pincus LLC ("Warburg" or "Warburg Pincus"). The Consolidated Complaint's § 11 and § 12 claims are **DISMISSED** to the extent they are based on statements regarding the drillstem rates for certain Kosmos oil wells. The Motions to Dismiss are **DENIED** as to all other requested relief.

## I.

## BACKGROUND

This putative class action case concerns Lead Plaintiff Nursing Homes and Related Industries Pension Plan's[2] (the "Pension Plan") allegations of securities law violations against Kosmos.

---

[1]The Court also uses the term "Kosmos" to refer collectively to the Defendants which filed the Motion to Dismiss at doc. 73.

[2]The Pension Plan was appointed as Lead Plaintiff on November 1, 2012. The Pension Plan filed its Consolidated Complaint on December 10, 2012.

Specifically, the Pension Plan alleges that Kosmos issued a false and misleading Registration Statement and Prospectus[3] in connection with Kosmos' May 11, 2011 initial public offering ("IPO"). Kosmos is an oil exploration and production company with a focus in West Africa. In June 2007, Kosmos discovered a large deepwater oil field offshore of Ghana called the Jubilee Field ("Jubilee"). The Jubilee Field was one of the largest oil discoveries in the world in 2007. In 2009, Kosmos entered into partnerships with gas exploration companies to spend over $3.3 billion to develop Jubilee. Oil production from Jubilee began in November 2010, and Kosmos received its first oil revenues from the field in early 2011. Oil revenues from Jubilee were Kosmos' sole source of revenue since Kosmos' inception. Consolidated Compl. ("Compl.") ¶¶ 2-3.

In 2011, Kosmos filed its Registration Statement with the SEC in connection with the planned IPO of Kosmos common stock. On May 10, 2011, the Registration Statement was declared effective by the SEC and Kosmos sold $620 million of Kosmos stock. By August 2012, however, Kosmos' stock had declined to half of the IPO price. The Pension Plan, which bought stock in connection with the Kosmos IPO, now alleges that the Registration Statement included several false and misleading statements regarding the then-current performance of Jubilee and overly optimistic projections regarding Jubilee's future production. It alleges that the now-public production problems at Jubilee which were omitted from the Registration Statement "caused significant delays, hundreds of millions of dollars in remediation expenses, and hundreds of millions of dollars in lost revenue." Compl. ¶¶ 4-6.

As result of the foregoing, the Pension Plan now brings strict liability claims under Sections

---

[3]The complaint alleges that the Registration Statement and the Prospectus are "identical in all relevant parts," Compl. 1 n.1, and the Court uses these terms interchangeably.

11,[4] 12(a)(2),[5] and 15[6] of the Securities Act of 1933 against Defendants. Defendants include Kosmos, the issuer of the stock at issue; several individuals who are officers or directors of Kosmos ("the Individual Defendants");[7] Citigroup Global Markets Inc. ("Citigroup"), Barclays Capital Inc. ("Barclays"), and Credit Suisse Securities (USA) LLC ("Credit Suisse"), who served as co-lead underwriters for the IPO (collectively the "Underwriter Defendants"); and Blackstone and Warburg Pincus, private equity companies that own significant positions in Kosmos (the "Shareholder Defendants").[8] These Defendants have filed Motions to Dismiss, which are now ripe for the Court's disposition.

## II.

---

[4]Section 11 is codified at 15 U.S.C. § 77k.

[5]Section 12(a)(2) is codified at 15 U.S.C. § 77l(a)(2).

[6]Section 15 is codified at 15 U.S.C. § 77o.

[7]The Individual Defendants include Brian F. Maxted, Chief Executive Officer and a director of Kosmos; W. Greg Dunlevy, Chief Financial Officer and Executive Vice President of Kosmos; Sylvia Manor, Vice President and Controller of Kosmos; John R. Kemp, a director of Kosmos and Chairman of the Board; David I. Foley, a director of Kosmos and designee of Blackstone's on the Kosmos Board; Jeffrey A. Harris, a director of Kosmos and a designee of Warburg Pincus on the Kosmos Board; David B. Krieger, a director of Kosmos and a designee of Warburg Pincus on the Kosmos Board; Prakash A. Melwani, a director of Kosmos and a designee of Blackstone on the Kosmos Board; Adebayo O. Ogunlesi, a director of Kosmos; Chris Tong, a director of Kosmos; and Christopher A. Wright, a director of Kosmos. The Consolidated Complaint alleges that all of the Individual Defendants signed the allegedly false and misleading Registration Statement. Compl. ¶¶ 13-24.

[8]The Consolidated Complaint also names BPN Paribas Securities Corp.; SG Americas Securities LLC; Credit Agricole Securities (USA) Inc.; Howard Weil Incorporated; HSBC Securities (USA) Inc.; Jefferies & Company, Inc.; Natixis Bleichroeder LLC; and RBC Capital Markets LLC as additional underwriter defendants ("the Non-Lead Underwriter Defendants"). Although it appears that none of these entities have been served in this action, the parties stipulated that the Non-Lead Underwriter Defendants would waive any objection to the absence of a summons or service and would be permitted to join Kosmos' Motion to Dismiss. Stipulation Feb. 7, 2013. The Non-Lead Underwriter Defendants then filed their Joinder on February 11, 2013.

**LEGAL STANDARD**

In analyzing a complaint under Federal Rule of Civil Procedure 12(b)(6), the Court accepts all well-pleaded facts as true, viewing them in the light most favorable to the plaintiff. *Martin K. Eby Constr. Co. v. Dall. Area Rapid Transit*, 369 F.3d 464, 467 (5th Cir. 2004). The complaint should be dismissed only if it does not include enough facts to state a claim to relief that is plausible on its face. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A claim must be "nudged . . . across the line from conceivable to plausible." *Id.* "A pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 555). Further, "[f]actual allegations must be enough to raise a right to relief above the speculative level . . . ." *SW Bell Tel., LP v. City of Hous.*, 529 F.3d 257, 260 (5th Cir. 2008) (quoting *Twombly*, 550 U.S. at 555).

**III.**

**ANALYSIS**

*A.     Section 11 Claims*[9]

Section 11 of the Securities Act "permits a securities purchaser to recover damages against, among others, signatories to a registration statement and directors of the issuer, if the registration statement contained an untrue statement of material fact or omitted to state a material fact required to be stated therein or necessary to make the statements therein not misleading." *Rosenweig v. Azurix Corp.*, 332 F.3d 854, 861 (5th Cir. 2003) (quoting 15 U.S.C. § 77k(a)). Section 11 requires only notice pleading under Federal Rule of Civil Procedure 8 rather than the heightened pleading

---

[9]The Consolidated Complaint asserts its § 11 claim against all Defendants except for the Shareholder Defendants, Blackstone and Warburg Pincus.

4

standards required by Federal Rule of Civil Procedure 9(b) or the Private Securities Litigation Reform Act ("PSLRA"). *Kapps v. Torch Offshore, Inc.*, 379 F.3d 207, 210 (5th Cir. 2004).

"A fact is material if there is a substantial likelihood that a reasonable shareholder would consider it important in making an investment decision." *Id.* at 213-14 (quoting *Basic Inc. v. Levinson*, 485 U.S. 224, 231 (1988)). For an omission to be material, there must be a "*substantial* likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having *significantly* altered the total mix of information made available." *Id.* at 214. Stated another way, a court must determine whether statements or omissions are materially misleading when read in the context of the prospectus as a whole. *Id.* at 211. Relevant to the issue of materiality is whether the alleged misstatements are coupled with cautionary language, as statements must be analyzed in context under the "bespeaks caution" doctrine. *Rubinstein v. Collins*, 20 F.3d 160, 167-68 (5th Cir. 1994). *See also In re Worlds of Wonder Secs. Litig.*, 35 F.3d 1407, 1414 (9th Cir. 1994) (bespeaks caution doctrine allows court to dismiss claims where defendant's forward looking statements contain enough cautionary language or risk disclosure to protect the defendant against claims of securities fraud)[10] (citations omitted). Thus, a court looking at whether alleged misstatements affect the total mix of information must consider whether such statements are misleading when coupled with cautionary language and any disclosures of firm-specific adverse facts or assumptions. *Rubinstein*, 20 F.3d at 167. However, notwithstanding the "bespeaks caution" doctrine, "cautionary language is not

---

[10]Some courts have explained that the bespeaks caution doctrine applies both to § 10(b) of the Securities Exchange Act and § 11 claims. *See, e.g., In re Worlds of Wonder*, 35 F.3d at 1415 n.3 (bespeaks caution doctrine "is primarily an application of the materiality concept, which applies equally" to both § 10(b) and § 11 claims). *See also Kapps*, 379 F.3d at 215 ("material," as used in § 11, means the same as "material" used in connection with § 10(b)).

necessarily sufficient, in and of itself, to render predictive statements immaterial as a matter of law."

*Id.*

The Consolidated Complaint identifies four main misleading statements or omissions in Kosmos' Prospectus. Specifically, the Pension Plan points to the following statements from the Prospectus:

a. "Since year-end [2010] our current production continues to increase according to our plan, currently achieving 60,000-70,000 boepd [barrels of oil equivalent per day]";

b. "We expect gross oil production from the Jubilee Field to reach . . . 120,000 barrels of oil per day ("bopd") in the third quarter of 2011";

c. "Our current production is consistent with our development plan and there have been no negative indicators that our production forecast [120,000 bopd] will not be met in 2011"; and

d. A chart on page 91, which showed that the J-08 and J-09 wells were producing oil and been drillstem tested at 16,500 bopd and 20,500 bopd, respectively.

Compl. ¶ 4. In the Pension Plan's view, these statements were false and misleading given that such statements portray the Jubilee Field as progressing as planned, when in reality such statements omitted multiple facts, existing at the time of the Prospectus and which were known to Kosmos, that made it clear that the Jubilee Field's production was not increasing according to plan and that Kosmos' production projections would not be met. *See* Compl. ¶¶ 36-45.

As an initial matter, before proceeding to an examination of the four alleged misstatements, the Court notes the Prospectus' cautionary language, more specifically the extensive warnings in the Prospectus regarding the risks of oil production and the difficulty of making accurate projections regarding future performance. As highlighted by Kosmos, the warnings include statements such as:

1. "Exploring for and developing hydrocarbon reserves involves a high degree of operational and financial risk." Kosmos App. 22. Such risk "precludes definitive statements as to the time

required and costs involved in reaching certain objectives." *Id.*

2.      "Our construction and operation schedules may not proceed as planned and may experience delays or cost overruns." *Id.* at 31.

3.      Potential hazards might result in the "impairment, delay or cessation of [Kosmos'] operations" and "[t]he oil and natural gas business involves a variety of operating risks, including, but not limited to . . . mechanical and equipment problems, including unforeseen engineering complications . . . [and] formations with abnormal pressures." *Id.* at 31.

4.      Deepwater drilling projects like the Jubilee Field involve "higher risk of equipment failure" and possibly other, unknown, risks. *Id.* at 32.

5.      "Drilling may be unsuccessful for many reasons, including geologic conditions, weather, cost overruns, equipment shortages and mechanical difficulties." *Id.* at 22.

6.      In light of all these risks, "[a]ctual future production . . . will vary from our estimates." *Id.* at 26. *See also* Kosmos Mot. Dismiss 11-14[11] (discussing warnings in Prospectus).

With these warnings in mind, which are relevant to the issue of whether any misstatements or omissions were material, the Court will now proceed to examine the four alleged misstatements at issue.

      <u>1.</u>      <u>"Since year-end [2010] our current production continues to increase according to our plan, currently achieving 60,000-70,000 boepd."</u>

Kosmos argues that the complaint does not sufficiently allege that this statement is materially misleading in light of the Prospectus' specific warnings regarding the risks of oil production and

---

[11]The Court only briefly summarizes some of the warnings which are repeated throughout the Prospectus, including the nearly forty-page discussion of risk factors in pages 17-45 of the Prospectus. *See* Kosmos App. 21-45

cautionary statements regarding any production estimates. Kosmos also argues that the Consolidated Complaint contains insufficient allegations to show that Kosmos did not believe that production was proceeding according to plan, and it argues that the 60,000-70,000 boepd figure was correct and not misleading. In its view, production was proceeding according to the long-term plan contained in the Prospectus, specifically the construction and development of the wells and supporting infrastructure, and even if production was flat for a period of time, "[o]il wells do not come on production with magic on-off switches." Kosmos Mot. 16-17.

In response, the Pension Plan argues that such statement was false and misleading; in its view, the Consolidated Complaint alleges that production was not in fact increasing and the production of each well was declining, and thus it was not "increasing according to plan." *See* Compl. ¶¶ 36-37, 39-40. The Pension Plan describes a "flat-lining" of total oil production between year-end 2010 and May 10, 2011, when the Prospectus was issued, where additional wells came online with no corresponding increase of total production. *Id.*

In the Court's view, whether or not oil production was in fact flat and whether such fact would indicate that production was not increasing according to plan is not appropriately resolved through a motion to dismiss. To do so would require the Court to choose between two competing views of how production was actually proceeding in the Jubilee Field as well as two competing views as to how production normally proceeds in an oil field, and the Court may not engage in such factual determinations in resolving whether the Consolidated Complaint sufficiently alleges its claims. Accepting the allegations of the Consolidated Complaint as true, actual production was not increasing from the end of 2010 to the filing of the Prospectus. As such, the complaint alleges – contrary to the Prospectus – that production was not increasing according to plan. The Complaint

8

also alleges that Kosmos had access to daily production reports which showed that production was static and underperforming projections, contrary to the Prospectus' representation. *See* Compl. ¶ 39.

The Court also finds that the complaint adequately alleges that such information would be material to a reasonable investor in that it significantly alters the total mix of information. Accepting the allegations of the Consolidated Complaint as true, the overall success of Kosmos as a company was largely based on the success of the Jubilee Field. *See* Compl. ¶¶ 3, 5 (oil sales from Jubilee were sole source of Kosmos revenue and oil production had been focus of most earnings conference calls and investment conferences since the IPO). In other words, Kosmos' fortunes hinged on the fate of the Jubilee Field. Thus, the fact that overall production was static and that per-well production was decreasing would significantly alter the total mix of information available to investors – it would clearly affect whether or not Kosmos' future production goals, and future revenues projections, would likely be met. While the Prospectus makes it clear that developing oil wells is a risky proposition, the statement in the Prospectus that production in the first quarter was proceeding according to plan, when it was not increasing, was an untrue statement of material fact, taking the allegations of the Consolidated Complaint as true. Whether or not these goals would be met would also alter the total mix of information available to investors, affecting whether or not they would purchase Kosmos stock in the IPO. Once again, the Court recognizes that Kosmos' view of the progress of oil field development may differ from that of the Pension Plan's, but resolution of that issue is more appropriate on summary judgment. As such, Kosmos' Motion to Dismiss, to the extent it seeks dismissal of the Consolidated Complaint's claims based on the "increasing according to plan" statement is **DENIED**.

2.     "We expect gross oil production from the Jubilee Field to reach . . . 120,000 barrels

9

of oil per day ("bopd") in the third quarter of 2011."

Kosmos argues that its specific warnings about the risks of oil production preclude the Pension Plan's claim that this statement was a false statement of material fact. These warnings in the Prospectus include statements that actual future production may or would vary from Kosmos' estimates due to various problems such as mechanical and equipment problems. *See, e.g.*, Kosmos Mot. Dismiss 11-12 (citing Kosmos App. 22, 26, 31, 32). Kosmos also points to statements in the Prospectus that only five of the nine planned production wells were online at the time of the Prospectus, and Kosmos expected that the new wells would bring production up to that 120,000 bopd figure. Kosmos Mot. Dismiss 15.

In response, the Pension Plan argues that this statement was materially misleading in light of undisclosed facts that "seriously undermined the accuracy of the Production Forecast." Pl.'s Resp. Kosmos Mot. Dismiss 6. Specifically, the Pension Plan points to the following allegations which it argues show that the Production Forecast would never be met:

> (1) Kosmos derived the Production Forecast from flow rate projections for nine individual production wells . . . ; (2) at the time of the IPO, five of the nine wells had been brought online, but all five wells were underperforming their expected flow rates by 20%-50% and consistently declining in production before the IPO . . . ; (3) average per-well oil production at Jubilee decreased by nearly 40% in the five months leading up to the IPO . . . ; (4) these sharp production shortfalls and consistent declines were indicative of major, undisclosed oil production problems that substantially undercut the Production Forecast . . . ; (5) these shortfalls and declines were set forth in daily production reports, which were available to Defendants and provided the oil flow rates from each well . . . ; and (6) Kosmos had no remediation plan in place at the time of the IPO.

*Id.* (citing Compl. ¶¶ 37, 39, 40). The Pension Plan also cites other factors that it argues made it clear that the 120,000 bopd figure would not be met, including a catastrophic structural failure on one well in 2010, a design defect on the Jubilee wells which resulted in the wells becoming partially

clogged, and extensive rig maintenance in April and May 2011 and which led to a delay of forty days in that rig's production schedule. *Id.* at 7; Compl. ¶ 40.

In summary, the Pension Plan argues that this number was false in part due to the same reason that the Prospectus' statement that production was increasing according to plan was false – average per-well production was declining, indicating that it was unlikely that future production numbers would be met. However, there is a key distinction between this representation and the statement that production was increasing. Here, Kosmos was projecting future production, which is necessarily a projection subject to all of the risk factors in the Prospectus. In contrast, the statement regarding production increasing according to plan was a statement regarding then-current production.[12] Further, the Pension Plan does not dispute the then-current 60,000-70,000 bopd rate listed in the Prospectus, and the Pension Plan admits that not all of the wells had been brought online yet, so there is at least some basis for the 120,000 bopd figure. Indeed, the Consolidated Complaint alleges that production at the beginning of the third quarter of 2011 was 80,000 bopd, with 8 of the 9 wells online, though such figure is still well short of the 120,000 bopd projection. Compl. ¶¶ 43-44.

Nevertheless, taking the allegations of the complaint as true, the Pension Plan has adequately alleged that the statement that Kosmos expected projection to reach 120,000 bopd was both false and material. Although discovery may eventually indicate that Kosmos both believed the 120,000 bopd projection and had a reasonable basis for such figure, taking the allegations of the complaint as true, Kosmos had information that plausibly indicated that the projection would not be met,

---

[12]The complaint also implicitly assumes that the production shortfalls and declines were not accounted for in the 120,000 bopd figure, an assumption which Kosmos does not directly address.

specifically the declining per-well oil production figures in addition to multiple events which led to delays and which were known prior to the issuance of the Prospectus. *See Matrixx Initiatives, Inc. v. Siracusano*, 131 S.Ct. 1309, 1322 (2011) (accepting complaint as true, defendant received information that plausibly indicated a reliable causal link between defendant's product and adverse side effect, and complaint therefore alleged that omission of this information was material). Numerous detailed cautionary statements will not shield a defendant from liability for projections it knows or should know to be false, even if they disclose in general terms the risks that the defendant knows have materialized. As such, Kosmos' Motion to Dismiss, to the extent it seeks dismissal of the Consolidated Complaint's claims based on the 120,000 bopd projection is **DENIED**.

      3.      <u>"Our current production is consistent with our development plan and there have been no negative indicators that our production forecast will be not be met in 2011."</u>

For similar reasons the Court **DENIES** Kosmos' Motion to Dismiss to the extent it seeks dismissal of the Consolidated Complaint's claims based on the Prospectus' statement that there had been no negative indicators showing that Kosmos' production projection would not be met. Accepting the allegations of the Consolidated Complaint as true, both the fact that per-oil well production was decreasing and overall oil production was flat in early 2011 indicate that there were in fact negative indicators showing that it was unlikely that actual production would meet the forecast. Even in light of the Prospectus as a whole, such information, along with other significant events such as the mechanical failures and maintenance issues, would alter the total mix of information available to investors as they suggest a significant likelihood that production goals would not be met. The Court recognizes, once again, that the Prospectus contains numerous warnings regarding the risks of oil production, including the possibility that production estimates would vary

12

from actual future production. However, accepting the allegations of the complaint as true and viewing this statement regarding "no negative indicators" in the context of the Prospectus as a whole, Kosmos had information indicating that production goals would not be met, and there is a significant probability that a reasonable investor would find such information material in determining whether to purchase Kosmos stock.

4.      J-08 and J-09 drillstem rates

The Pension Plan argues that providing the drillstem rates of the J-08 and J-09 wells was misleading given that the drillstem rate overstated the actual production of those two wells. The complaint alleges:

> A chart on page 91 of the Registration Statement provided that the J-08 and J-09 wells were producing oil, and had been drillstem tested at 16,500 bopd and 20,500 bopd, respectively. This misstatement was misleading when made, as the Registration Statement omitted material facts when necessary to make this statement not misleading . . . . As of the IPO, the J-08 and J-09 wells were online and producing oil at rates 20-30% below their drillstem-tested rates, and both wells failed to increase in productivity at all in the months leading up to the IPO. Defendants omitted this information and included only the drillstem test rates for J-08 and J-09. A drillstem test is simply a preliminary test – conducted during drilling, before the actual well is even constructed (or 'completed') – used to predict how much oil a well will produce once that well is built and brought online. However, once an oil well is constructed and comes into production, any prior drillstem test is irrelevant to measuring well productivity. It was therefore misleading for Kosmos to provide preliminary test numbers and omit the actual oil production rates which were far below the outdated and irrelevant drillstem test rates.

Compl. ¶¶ 41-42. In essence, the Pension Plan argues that the drillstem rates are misleading given that the wells were already producing and Kosmos should have provided the actual production rates. In response, Kosmos argues that such statement was not false and was not material, given that it did not alter the "total mix" of information.

The Court agrees that the Consolidated Complaint has not sufficiently alleged that the chart

on page 91 was materially misleading. As alleged by the complaint, a drillstem test predicts the productivity of a well and does not purport to state actual production, even though the chart does say these wells were producing. Further, the Court notes that the two drillstem rates were only two points of data on the chart, which listed information on twenty separate wells in the Jubilee Field along with data for several other wells in Ghana. Although the Court assumes, for the purposes of the motions to dismiss, that the drillstem rate is "irrelevant to measuring oil productivity" once production has begun, the Consolidated Complaint does not allege that the drillstem rate was presented as a measure of actual production. Further, the Court notes the multiple warnings in the Prospectus identifying the numerous risks in oil production which could result in lower than expected actual production. *See, e.g.*, Kosmos App. 22, 26, 31, 32. Overall, in context of the entire Prospectus, the complaint does not allege that this chart contained materially misleading statements, as it does not allege a *substantial* likelihood that disclosing the actual production rates, as opposed to the drillstem rates for the two wells, would have been viewed by the reasonable investor as having *significantly* altered the total mix of information in the Prospectus. As such, the Consolidated Complaint's § 11 claim, to the extent it is based on Kosmos' reporting of the drillstem rates of the J-08 and J-09 wells in the Prospectus is **DISMISSED WITHOUT PREJUDICE**.

B.      *Section 12(a)(2) Claims*[13]

        Under § 12 of the Securities Act, any person who sells a security on the basis of a prospectus that included a material misstatement or omission shall be liable "to the person purchasing such

---

[13]In its Response to Kosmos' Motion to Dismiss, the Pension Plan states that it is "not pressing forward" with its § 12(a)(2) claim against the Individual Defendants and the Shareholder Defendants, leaving its § 12 claims pending only as to Kosmos and the Underwriter Defendants. *See* Pl.'s Resp. Kosmos Mot. Dismiss 18 n.11.

security from him." 15 U.S.C. § 77l(a); *Rosenweig*, 332 F.3d at 870-71 (5th Cir. 2003) (quoting statute). As explained by *Rosenweig*, the Supreme Court interpreted this language to mean that a § 12(a) seller "includes either the person who actually passes the title to the buyer, or 'the person who successfully solicits the purchase, motivated at least in part by a desire to serve his own financial interests or those of the securities owner,' *e.g.*, a broker." 332 F.3d at 871 (quoting *Pinter v. Dahl*, 486 U.S. 622, 647 (1988)). The Court will examine Kosmos' and the Underwriter Defendants' arguments regarding the § 12(a)(2) claims below.

1.   Kosmos

As an initial matter, the Consolidated Complaint does not allege, and the Pension Plan does not argue, that Kosmos qualifies as a § 12(a)(2) statutory seller under the solicitation prong under *Pinter*. In *Rosenweig*, the Fifth Circuit explained that merely signing the registration statement does not suffice for solicitation, as the seller must at least directly communicate with the buyer to qualify as solicitation under the statute. *Id.* Indeed, to find an issuer liable under the solicitation prong, the plaintiff must allege "that an issuer's role was not the usual one; that it went farther and became a vendor's agent." *Lone Star Ladies Inv. Club v. Schlotzsky's, Inc.*, 238 F.3d 363, 370 (5th Cir. 2001) (citing *Pinter*, 486 U.S. at 644). The Consolidated Complaint makes no allegations that Kosmos actively solicited purchases or otherwise took a larger than normal role as issuer. As such, Kosmos may not be liable under § 12(a)(2) based on solicitation.

Next, the Court looks to whether Kosmos passed title to any of the shares sold to the Pension Plan. The *Lone Star Ladies* court explained that " in a firm commitment underwriting[14] . . . the public

---

[14]In a firm commitment underwriting, the issuer, or the company issuing the stock, sells all stock being issued to the underwriters, who then sell the stock to the public. *See Lone Star Ladies*, 238 F.3d at 367.

cannot ordinarily hold the issuers liable under section 12, because the public does not purchase from

the issuers" but "[r]ather, the public purchases from the underwriters." *Id.* at 370. Here, the Pension

Plan does not dispute that Kosmos' stock was sold through a firm commitment underwriting and that

the public did not purchase any stock in the IPO directly from Kosmos. Thus, under existing Fifth

Circuit case law, the Pension Plan does not sufficiently allege a § 12(a)(2) claim against Kosmos.

In spite of existing Fifth Circuit law, the Pension Plan argues that Kosmos may be held liable

pursuant to the SEC's interpretation of § 12(a)(2) at 17 C.F.R. § 230.159A(a) ("Rule 159A").

There, the SEC stated:

> For purposes of section 12(a)(2) of the [Securities] Act only, in a primary offering of
> securities of the issuer, regardless of the underwriting method used to sell the issuer's
> securities, seller shall include the issuer of the securities sold to a person as part of the
> initial distribution of such securities, and the issuer shall be considered to offer or sell
> the securities to such person . . . ."

*Id.*[15] The parties do not appear to dispute that this interpretation, if binding, would subject Kosmos,

as an issuer, to liability under § 12(a)(2). However, they dispute whether this interpretation is in fact

binding on this Court. The Pension Plan argues that the SEC's interpretation is controlling authority

pursuant to *National Cable and Telecommunications Association v. Brand X Internet Services*, 545 U.S.

967, 979-85 (2005). In response, Kosmos argues that the Supreme Court's decision in *Pinter* and

subsequent Fifth Circuit cases remain binding on the Court, despite Rule 159A.

In *Brand X*, the Supreme Court held that "[a] court's prior judicial construction of a statute

trumps an agency construction otherwise entitled to *Chevron* deference only if the prior court

decision holds that its construction follows from the unambiguous terms of the statute and thus

---

[15]Rule 159A was promulgated in 2005. *See* 70 Fed. Reg. 44,722, 44, 805 (Aug. 3, 2005).

leaves no room for agency discretion." 545 U.S. at 982. Stated differently, "[o]nly a judicial precedent holding that the statute unambiguously forecloses the agency's interpretation, and therefore contains no gap for the agency to fill, displaces a conflicting agency construction." *Id.* at 982-83. Thus, the Court must determine whether the Supreme Court's holding in *Pinter* unambiguously foreclosed the SEC's interpretation of § 12(a)(2) found in Rule 159A.

The Court finds that *Pinter* forecloses the SEC's interpretation. The *Pinter* court did not state directly that § 12(a)(2) was unambiguous, and this Court recognizes that *Pinter* stated that "the Securities Act nowhere delineates who may be regarded as a statutory seller, and the sparse legislative history sheds no light on the issue." 486 U.S. at 642. However, such statement does not amount to a finding that the statute was ambiguous. The *Pinter* court noted that § 12(a)(2) states that only a defendant "from" whom the plaintiff purchased securities may be liable. *Id.* at 643-44. Interpreting this language, the court explained, albeit in a footnote, that "one important consequence of this provision is that § 12(1)[16] imposes liability on only the buyer's immediate seller; remote purchasers are precluded from bringing actions against remote sellers. Thus, a buyer cannot recover against his seller's seller."[17] *Id.* at 644 n.21. The court further explained that "[t]here is no

---

[16]As explained by the Fifth Circuit, "*Pinter* involved a claim under § 12(1) (now § 12(a)(1)), but that analysis applies identically to § 12(a)(2)." *Rosenweig*, 332 F.3d at 871 n.10 (citation omitted).

[17]Also looking at the language and legislative history of the Securities Act, the Supreme Court found that a "seller" under § 12 includes both one who passes title to securities and also those who solicit purchases, stating that it was "quite clear that when a broker acting as agent of one of the principals to the transaction successfully solicits a purchase, he is a person from whom the buyer purchases within the meaning of § 12 and is therefore liable as a statutory seller." *Id.* at 646. In contrast, the court found that the language of § 12 did not support liability for a person who "touts unregistered securities" if the prospective buyer does not purchase the securities, nor did it support liability where a person solicits a purchase "but whose motivation is solely to benefit the buyer." *Id.* at 644-47. Similarly, the court explained that it was not enough that a defendant participated in soliciting the purchase or was a substantial factor in causing the sale of securities to hold the defendant liable under § 12. *Id.* at 651 n.27.

support in the statutory language or legislative history for expansion of § 12(1) primary liability beyond persons who pass title and persons who 'offer,' including those who solicit' offers." *Id.* at 650. Bolstering this conclusion was the court's view that § 12's "failure to impose express liability for mere participation in unlawful sales transactions suggests that Congress did not intend that the section impose liability on participants[] collateral to the offer or sale." *Id. See also Rosenweig*, 332 F.3d at 871 (citing *Pinter* and *Lone Star Ladies* for proposition that the public cannot hold issuers liable under § 12 in a firm commitment underwriting given that "suing the issuers is an attempt to recover against the seller's seller").

In this Court's view, such statement amounts to a determination by the Supreme Court that, based on the unambiguous terms of the statue, one may not recover from an issuer where the plaintiff purchased the shares from the underwriter, absent other circumstances such as solicitation by the issuer, given that the plaintiff did not purchase the shares "from" the issuer. Such interpretation by the Supreme Court leaves no gap for the SEC to fill, and it forecloses the SEC's determination that issuers are liable as statutory sellers under § 12(a)(2). *See In re Countrywide Fin. Corp. Mortg.-Backed Secs. Litig.*, Nos. 2:11-ML-02265-MRP (MANx), 2:12-CV-1059 MRP (MANx), — F. Supp. 2d. —, 2013 WL 1189311, *15 (C.D. Cal. Mar. 15, 2013) ("*Pinter* was unambiguous, and there were no statutory gaps for the SEC to fill," meaning that Rule 159A did not apply due to the SEC exceeding the statutory language of § 12(a)(2)). *See also Mass. Mut. Life Insur. Co. v. Residential Funding Co.*, 843 F. Supp. 2d 191, 207 (D. Mass. 2012) (noting that only two courts had applied Rule 159A since it became effective and explaining that Rule 159A could not countermand a contrary Supreme Court

holding; therefore plaintiff would have to show issuer was directly involved in the actual solicitation of a securities purchase); *Me. St. Ret. Sys. v. Countrywide Fin. Corp.*, No. 2:10-CV-302 MRP (MANx), 2011 WL 4389689, *9-10 (C.D. Cal. May 5, 2011) (plaintiff must include very specific allegations of solicitation, including direct communications with plaintiffs, in order to plead § 12(a)(2) claim against issuers, and explaining that only one court had applied Rule 159A and numerous others had found that issuers may only be statutory sellers under the solicitation prong). *But see In re Oppenheimer Rochester Funds Grp. Secs. Litig.*, 838 F. Supp. 2d 1148, 1179-80 (D. Colo. 2012) (Rule 159A provides that issuers of securities are statutory sellers for the purposes of § 12(a)(2) but courts may limit liability in firm commitment underwriting scenarios to issuers who "sufficiently promote or 'solicit' the public as to essentially become the vendor's agent" given that liability under § 12 is "focused on those from whom a shareholder 'purchases'") (citations omitted); *Citiline Holdings, Inc. v. iStar Fin. Inc.*, 701 F. Supp. 2d 506, 512 (S.D.N.Y. 2010) (finding that issuer is statutory seller under Rule 159A but finding that individual defendants were statutory sellers only if they directly passed title to the securities or solicited the purchase of securities to serve their own interests or the interests of the securities' owners).

Given the Court's determination that Rule 159A does not disturb existing Supreme Court precedent, it also finds that Rule 159A does disturb Fifth Circuit precedent interpreting *Pinter*. As such, the Pension Plan's § 12(a)(2) claim against Kosmos must fail, as the Consolidated Complaint does not allege that Kosmos sold stock directly to the Pension Plan or solicited the Pension Plan's purchase beyond the normal role of issuers in a firm commitment underwriting. As such, the Consolidated Complaint's § 12(a)(2) claim is **DISMISSED** as to Kosmos.

19

2.    Underwriter Defendants[18]

The Underwriter Defendants, Citigroup, Barclays, and Credit Suisse, seek dismissal of the §
12 claims based on their argument that the Consolidated Complaint does not allege that they bought
stock directly from the Underwriter Defendants. The complaint alleges that "Defendants sold
Kosmos stock directly to Lead Plaintiff and/or other members of the Class" and the "Underwriter
Defendants underwrote and promoted the sale of Kosmos stock to Lead Plaintiff and the Class."
Compl. ¶ 65. In their view, these allegations "fail to establish either that the Underwriter Defendants
sold shares directly to the Plan or that they solicited the Plan's purchases through direct
communications with the Plan." Kosmos Mot. 24-25 (citing *In re Fleming Cos. Sec. & Derivative Litig.*,
No. CIVA503MD1530TJW, MDL–1530, 2004 WL 5278716, *51 (E.D. Tex. June 16, 2004)). In
response, the Pension Plan argues that, looking at the complaint, along with the attached registration
statement and its PSLRA certification, it has alleged that the Underwriter Defendants passed title
to every single share of Kosmos stock offered to the public in the IPO, including the 72,600 shares
of Kosmos stock purchased by the Pension Plan at the IPO price of $18 per share on May 10, 2010.[19]
Pl.'s Resp. Kosmos Mot. 24.

The Court finds that, looking at the Consolidated Complaint along with the Prospectus and
the other filings in this case, the Pension Plan has alleged that the Underwriters sold the stock at

---

[18]As previously stated, the Non-Lead Underwriter Defendants submitted their Joinder to Kosmos'
Motion to Dismiss on February 11, 2013, and thus the Court's discussion with respect to Citigroup, Barclays,
and Credit Suisse applies equally to the Non-Lead Underwriter Defendants.

[19]The Pension Plan's prior filings in this case indicate that it made two separate purchases of Kosmos
stock on May 10, 2011, one of 6,000 shares and another of 66,600 shares, both at the IPO price of $18 per
share. Pension Plan App. to Opp'n to Competing Mots. for Appointment as Lead Pl. (doc. 62-1 filed Oct.
4, 2012).

issue in the Complaint directly to the Pension Plan. The Court recognizes that the complaint is not a model of clarity with respect to the allegations regarding the Underwriter Defendants. Nevertheless, reading the complaint in a light most favorable to the Plaintiff, the Pension Plan has alleged that it purchased shares directly from the Underwriter Defendants in the IPO. The Court takes notice of the Appendix in Support of the Pension Plan's Opposition to the Competing Motions for Appointment as Lead Plaintiff, which indicates that the Pension Plan purchased 72,600 shares at the IPO price of $18. Given this price and the allegations of the complaint, which alleges that on May 10, 2011, "the SEC declared the Registration Statement effective and defendants [including the Underwriter Defendants] sold approximately 35 million shares, or approximately $620 million, of Kosmos common stock to Lead Plaintiff and members of the Class ," Compl. ¶ 33, the Pension Plan has sufficiently alleged that it purchased shares directly from the Underwriter Defendants.[20] *Accord In re Westinghouse Secs. Litig.*, 90 F.3d 696, 718 (3d Cir. 1996) (*Pinter* did not hold that plaintiffs are required to allege which underwriter sold securities to each plaintiff). For this reason, Kosmos' Motion to Dismiss, to the extent it seeks dismissal of the § 12(a)(2) claim against the Underwriter Defendants for failure to allege that the Underwriter Defendants sold stock to the Pension Plan, is **DENIED**.

C.     *Section 15 Claims*

       Under § 15 of the Securities Act, anyone who controls persons liable under § 11 or § 12 of

---

[20]The Court also notes that the Consolidated Complaint alleges that the Underwriter Defendants "underwrote and promoted the sale of Kosmos stock to Lead Plaintiff and the Class." Compl. ¶ 65. However, the Pension Plan does not rely on the solicitation prong in responding to the Motions to Dismiss. As such, the Court does not express an opinion as to whether the Consolidated Complaint sufficiently alleges § 12(a)(2) liability as to the Underwriter Defendants based on their solicitation in connection with the IPO and the sales to the Pension Plan.

the Securities Act can be held jointly and severally liable to the same extent as the persons they control. 15 U.S.C. § 77o. To allege control person liability under § 15, the plaintiff must allege both a primary violation of § 11 or § 12 and the defendant's control over the primary violator. *Pierce v. Morris*, Civ. Action No. 4:03-cv-026-Y, 2006 WL 2370343, *3 (N.D. Tex. Aug. 16, 2006); *see also Kapps*, 379 F.3d at 221 (§ 15 claim failed because plaintiff failed to allege underlying § 11 violation); *Rosenweig*, 332 F.3d at 863 (control person liability of § 15 is derivative of § 11 and 12 liability of the principal). 17 C.F.R. § 230.405 defines "control" for purposes of the securities laws as "the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a person, whether through the ownership of voting securities, by contract, or otherwise."[21] *See also Dennis v. Gen. Imaging, Inc.*, 918 F.2d 496, 509 (5th Cir. 1990) (quoting 17 C.F.R. § 230.405).

The Consolidated Complaint asserts its § 15 claim against the Individual Defendants and the Shareholder Defendants, Blackstone and Warburg Pincus, alleging that each is a control person under § 15:

> [B]y virtue of his or her position as an owner, director and/or senior officer of Kosmos. The Individual Defendants each had a series of direct and/or indirect business and/or personal relationships with other directors and/or officers and/or major shareholders of Kosmos. At the start of the IPO, Blackstone owned 37% and Warburg owned 45% of the Company. Blackstone exercised control over Kosmos through Blackstone's designees on the Company's board of directors, defendants Melwani and Foley. Warburg exercised control through its designated directors, defendants Krieger and Harris.
>
> Each of the Individual Defendants, Blackstone and Warburg was a culpable participant in the violations of § 11 of the Securities Act alleged in the Count above, based on their having signed or authorized the signing of the Registration Statement and having otherwise participated in the process, which allowed the IPO to be

---

[21]The Fifth Circuit has explained that the control person sections of § 15 of the 1933 Act and § 20 of the 1934 Act are interpreted the same, "at least with respect to the definition of 'controlling person.'" *Abbott v. Equity Grp., Inc.*, 2 F.3d 613, 619 & n.15 (5th Cir. 1993) (citation omitted).

successfully completed.

Compl. ¶¶ 70-71. The Court will examine the allegations with respect to the Individual Defendants and Shareholder Defendants below.

> 1.    Primary Violation of Section 11 or 12

The Individual Defendants and the Shareholder Defendants first argue that the Consolidated Complaint does not allege any primary violation of § 11 or § 12. Given that the Court already determined that the Consolidated Complaint alleges a primary violation of § 11 and § 12, the Motions of the Individual Defendants and the Shareholder Defendants, to the extent they seek dismissal of the § 15 claim against them based on a failure to allege a primary violation of § 11 or 12, are **DENIED**.

> 2.    Do Blackstone and Warburg "Control" Kosmos?[22]

The Shareholder Defendants, Blackstone and Warburg Pincus seek dismissal of the § 15 claim against them based on a failure to allege control over Kosmos. They argue that the Pension Plan has merely alleged that Warburg and Blackstone owned common stock and separately appointed four of the Individual Defendants to Kosmos' Board of Directors, which they argue are insufficient allegations to show that either Shareholder Defendant controlled Kosmos. The Shareholder Defendants also argue that the Pension Plan has sued the wrong entities, as the stocks allegedly held by the Shareholder Defendants are in fact owned by their subsidiaries. In response, the Pension Plan argues that the complaint, read alongside the Registration Statement, shows that the

---

[22]The Pension Plan indicated in its Response to Kosmos' Motion to Dismiss that it was not pursuing its § 12(a)(2) claims against the Shareholder Defendants, and thus the § 15 control person liability claim is the only claim remaining against the Shareholder Defendants. *See* Pl.'s Opp'n Kosmos Mot. Dismiss at 18 n.11.

Shareholder Defendants controlled their subsidiaries which held the stock and are thus liable under agency theory. The Pension Plan also argues that it has alleged that Blackstone and Warburg Pincus "controlled a majority of the voting power of Kosmos's issued and outstanding shares, and have acted and continue to act together to control Kosmos." Pl.'s Opp'n Shareholder Defs.' Mots. Dismiss 7 (citing Compl. ¶ 31).

Here, the Consolidated Complaint's allegations of control are based almost entirely on the Shareholder Defendants' stock ownership and the fact that they each designated two of their employees as directors of Kosmos. Nevertheless, as one court in the Northern District has found, "[s]tatus alone as to persons not involved in day to day management is legally insufficient to support" a control person claim. *Zishka v. Am. Pad & Paper Co.*, No. Civ. A. 3:98-cv-0660-M, 2001 WL 1748741, *1 (Sept. 28, 2001) (discussing § 20 control person liability). Thus, the *Zishka* court found that allegations that certain investment funds held 38-50% of the stock of the controlled entity and had the power to appoint and did place three persons on the controlled entity's board who were affiliated with the investment fund were insufficient to allege "sufficient exercise of power and control" by the investment funds as to the challenged acts. *Id.*

Another district court outside the Northern District explained that the "mere fact" that certain outside directors held high positions with certain allegedly controlling corporations and were appointed to the primary violator's board by those corporations, "cannot, standing alone, establish that they acted as agents, or acted under the control," of those defendants. *In re Global Crossing Secs. Litig.*, No. 02 Civ. 910(GEL), 2005 WL 1907005, *4 (S.D.N.Y. Aug. 8, 2005). Rather, when acting as outside directors, the outside directors had fiduciary duties to act on behalf of the shareholders of the controlled entity itself, not on behalf of their employers who appointed them to the board.

24

"Thus, when they acted as directors of [the controlled entity], they were not acting within the scope of their employment" with the defendant corporations holding stock in the controlled entities. *Id.* at \*3. Accordingly, the court held that two corporations' 15.8% ownership, the right to designate individuals to sit on the controlled entity's board, and other factors such as the corporations' shareholder agreement with the controlled entity requiring their approval of certain strategic decisions by the controlled entity were insufficient to allege the corporations' control over the controlled entity. *Id.* at \*1-2, \*9-10.[23]

Here, the Court also cannot assume that Warburg's and Blackstone's designees on the Kosmos Board of Directors were acting on behalf of Warburg and Blackstone in their capacity as Kosmos directors. Even assuming that the Pension Plan asserted an agency theory in the Consolidated Complaint, there are no allegations in the complaint in support of such theory. The Court recognizes that the Pension Plan raises such a theory in its Opposition to Blackstone and Warburg's Motions to Dismiss, but a plaintiff may not amend its complaint in response to a motion to dismiss. The Consolidated Complaint is also devoid of any allegations of the Shareholder Defendants' control over Kosmos aside from their stock ownership and the fact that they designated their own employees as directors on the Kosmos board. Absent are any allegations that Blackstone

---

[23]The Court agrees with Blackstone and Warburg Pincus that *Paul F. Newton & Co. v. Tex. Commerce Bank*, 630 F.2d 1111, 1115-19 (5th Cir. 1980), does not hold that a court can assume agency or *respondeat superior* and consider statements in the registration statement that Foley, Melwani, Harris, and Krieger were employees of Blackstone and Warburg Pincus to assume that they were acting on behalf of the Shareholder Defendants in their capacity as directors of Kosmos. Rather, *Newton* found that § 15 and § 20 were not the exclusive methods by which secondary liability may be imposed under securities laws, as common law agency principles "remain viable in actions brought under the Securities Exchange Act and provide a means of imposing secondary liability for violations of the Act independent of § 20(a)." *Id.* at 1118. Here, the Consolidated Complaint does not assert secondary liability claims based on an agency theory against the Shareholder Defendants for violations of § 11 or § 12, instead asserting only § 15 claims. As such, *Newton* has limited applicability to this case.

or Warburg were somehow involved in Kosmos' operations (day-to-day or long-term), decision-making, or planning.[24] *See Abbott*, 2 F.3d at 619-621 (discussing, *inter alia*, *G.A. Thompson & Co. v. Partridge*, 636 F.2d 945, 958 (5th Cir. 1981) and *Dennis*, 918 F.2d at 509).

Nor does the Court find availing the Pension Plan's arguments in its Opposition that Kosmos had elected to be treated as a "controlled entity" under New York Stock Exchange ("NYSE") rules. While the Court takes notice of the entirety of the Registration Statement, Kosmos' statement that it was a controlled company under NYSE rules is largely irrelevant in determining whether the complaint alleges control person liability. Based on the Registration Statement, the only requirement for "controlled company" status under NYSE rules is that "more than 50% of [Kosmos'] voting power is held by funds affiliated with [its] Investors, acting as a group."[25] Kosmos App. 132. Further, the Pension Plan has not identified and the Court has not found any cases finding that such status under NYSE rules is relevant to the issue of control under securities laws. *Accord Shaughnessy v. Interpub. Grp. of Cos.*, No. 09-12077, 2010 WL 2630164, *5 (E.D. Mich. June 28, 2010) (NYSE is a "self-regulatory organization which is completely separate and distinct from the SEC" and thus the court could not find "any logical reason to conclude that a violation of an NYSE rule is [] tantamount to a violation of the Securities Exchange Act and, thus, in contravention of public policy").

---

[24]The Court also does not credit the Pension Plan's conclusory assertion that Warburg and Blackstone acted jointly based on the bare allegation that "[a]t all relevant times, defendants Blackstone and Warburg have controlled a majority of the voting power of Kosmos's issued and outstanding common shares, and have acted and continue to act together to control Kosmos," given the lack of allegations of how the Shareholder Defendants were involved in Kosmos' affairs, either separately or jointly. *See* Compl. ¶ 31. The only allegation which suggests any particular involvement by the Shareholder Defendants is the allegation that "Kosmos, Individual Defendants, Blackstone and Warburg selected the Underwriter Defendants to sell Kosmos stock in connection with the IPO." *See* Compl. ¶ 65.

[25]The Registration Statement explains that electing status as a controlled company under NYSE rules allowed Kosmos to take advantage of certain exceptions to NYSE reporting requirements. Kosmos App. 128.

Overall, the Consolidated Complaint does not sufficiently allege a § 15 claim against Warburg and Blackstone as it does not properly allege that the Shareholder Defendants had the requisite control over Kosmos, specifically the requisite power to directly or indirectly control or influence Kosmos' corporate policy.[26] *See G.A. Thompson*, 636 F.2d at 958. As such, the § 15 claim is **DISMISSED WITHOUT PREJUDICE** as to Warburg and Blackstone.

## IV.

### CONCLUSION

For the reasons listed above, Defendants' Motions to Dismiss are **GRANTED IN PART** and **DENIED IN PART**. The Consolidated Complaint's § 12(a)(2) claim is **DISMISSED WITHOUT PREJUDICE** as to Kosmos. The Consolidated Complaint's § 15 claim is **DISMISSED WITHOUT PREJUDICE** as to Warburg and Blackstone. The Consolidated Complaint's § 11 and § 12 claims are **DISMISSED** to the extent they are based on statements regarding the drillstem rates for certain Kosmos oil wells. The Motions to Dismiss are **DENIED** as to all other requested relief.

The Court does not take lightly dismissal of a claim without reaching its merits. Thus, a plaintiff will be given the opportunity to amend a complaint where it appears that more careful or detailed drafting might overcome the deficiencies on which dismissal is based. *Hart v. Bayer Corp.*, 199 F.3d 239, 248 n.6 (5th Cir. 2000) (noting that a court may dismiss a claim for failing to comply with Rule 9(b), but "it should not do so without granting leave to amend, unless the defect is simply incurable or the plaintiff has failed to plead particularity after being afforded repeated opportunities to do so") (citation omitted); *Hitt v. City of Pasadena*, 561 F.2d 606, 608 (5th Cir. 1977) (observing

---

[26]The Court assumes, but does not decide, that the Shareholder Defendants are proper defendants in this suit even though their sponsored funds are the actual owners of Kosmos stock.

27

that a complaint should only be dismissed under Rule 12(b)(6) "after affording every opportunity for the plaintiff to state a claim upon which relief can be granted" (citation omitted)).

If the Pension Plan is able to replead any Counts to overcome all of the grounds stated herein for dismissal, it must do so by no later than thirty (30) days from the date of this Order. Further, any repleading shall be accompanied by a synopsis of no more than ten (10) pages, explaining how the amendments overcome the grounds stated for dismissal in this Order. Should the Pension Plan replead, Defendants are hereby granted leave to file responses to the Pension Plan's synopsis. Any response shall not exceed ten (10) pages and must be filed within fourteen (14) calendar days of the repleading. No further briefing will be permitted.

SO ORDERED.

DATED: June 24, 2013.

JANE J. BOYLE
UNITED STATES DISTRICT JUDGE