UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| In re: | § | |
| | § | |
| KOSMOS ENERGY LTD. SECURITIES | § | CONSOLIDATED CIVIL ACTION NO. |
| LITIGATION | § | 3:12-CV-373-B |
| | § | |

## MEMORANDUM OPINION AND ORDER

This is a purported securities class action brought under §§ 11, 12(a)(2), and 15 of the

Securities Act of 1933 (the "1933 Act").[1] The issue before the Court is whether to grant Lead

Plaintiff's[2] motion to certify a class of investors who purchased or otherwise acquired common stock

from Defendant Kosmos Energy Ltd. ("Kosmos"), through its May 10, 2011 initial public offering

("IPO"), and were damaged thereby. Finding that Lead Plaintiff has failed to satisfy the rigorous

requirements of Fed. R. Civ. P. 23 which are fundamental to attaining class status, the Court

**DENIES** the Motion to Certify Class (doc. 119), as follows.

## I.

## INTRODUCTION

As described in numerous filings in this case,[3] Lead Plaintiff claims that Defendants issued

---

[1] The respective codification of Sections 11, 12(a)(2), and 15 are as follows: 15 U.S.C. §§ 77k, 77l(a)(2), and 77o.

[2] Lead Plaintiff is Nursing Home and Related Industries Pension Plan ( referred to in this opinion as "Lead Plaintiff", the "Pension Plan" and the "Plan").

[3] *See, e.g.*, *In re Kosmos Energy Ltd. Sec. Litig.*, 955 F. Supp. 2d 658 (N.D. Tex. 2013) (granting in part and denying in part motions to dismiss).

a Registration Statement[4] in connection with Kosmos' IPO that contained false and misleading statements regarding the performance and expected production of an oil field off the shore of Ghana known as the "Jubilee Field." Lead Plaintiff, who bought Kosmos stock in connection with the IPO, maintains that Defendants' failure to disclose the now-public production problems at Jubilee in the Registration Statement cost investors "hundreds of millions of dollars."[5]

As result of the foregoing, the Pension Plan and other investors filed suit against Defendants[6] under the strict liability provisions of §§ 11, 12(a)(2), and 15 of the 1933 Act. After consolidating the related suits, the Court appointed the Pension Plan lead plaintiff in this case.[7] The Plan, in turn, filed an Amended Consolidated Complaint on behalf of the investors on December 10, 2012.[8]

---

[4] The Registration Statement is "identical in all relevant parts" to the Prospectus. Pl.'s Mot. 1 n.2. At times, the Registration Statement and Prospectus are referred to as the "Offering Documents."

[5] Am. Consolidated Compl., Doc. 71, ("Compl.") ¶ 6.

[6] Defendants include (i) Kosmos; (ii) the Individual Defendants—Brian F. Maxted, W. Greg Dunlevy, Sylvia Manor, John R. Kemp III, David I. Foley, Jeffery A. Harris, David B. Krieger, Prakash A. Melwani, Adebayo O. Ogunlesi, Chris Tong, and Christopher A. Wright.; and (iii) the Underwriter Defendants—Citigroup Global Markets Inc., Barclays Capital Inc., Credit Suisse Securities (USA) LLC., BNP Paribas Securities Corp., SG Americas Securities LLC, Credit Agricole Securities (USA) Inc., Howard Weil Incorporated, HSBC Securities (USA) Inc., Jefferies & Company, Inc., Natixis Bleichroeder LLC, and RBC Capital Markets LLC. Two other defendants, Blackstone Group LP and Warburg Pincus LLC, were originally named, but the claims against them were dismissed by the Court's June 24, 2013 order (doc. 105).

[7] See Doc. 43 (order consolidating cases); Doc. 64 (order appointing lead plaintiff and lead counsel). The Pension Plan was appointed lead plaintiff pursuant to the Private Securities Litigation Reform Act of 1995, 15 U.S.C. § 78u-4(a)(3)(B). The Court also approved the Pension Plan's selection of the law firm of Robbins Geller Rudman & Dowd LLP as lead counsel and its selection of the Kendall Law Group, LLP as liaison counsel was also approved, pursuant to 15 U.S.C. § 78u-4(a)(3)(B)(v).

[8] Doc. 71. Defendants filed three motions to dismiss that were granted in part and denied in part on June 24, 2013. The § 15 claim was dismissed as to Warburg and Blackstone. The § 11 and § 12 claims were dismissed to the extent they were based on statements regarding the drillstem rates for certain Kosmos oil wells. All other relief sought in Defendants' motions was denied. The Plan chose not to amend, and thus the Amended Consolidated Complaint remains the operative pleading for purposes of class certification.

On October 3, 2013, Lead Plaintiff filed the Motion for Class Certification presently before the Court. In it, Lead Plaintiff moves the Court to certify its proposed class, appoint it as Class Representative, and appoint Lead Counsel in this case, Robbins Geller Rudman & Dowd LLP ("Robbins Geller"), as Class Counsel. The proposed class includes:

> All persons and entities who purchased or otherwise acquired Kosmos Energy Ltd. common stock issued pursuant to or traceable to Kosmos's initial public offering ("IPO") Registration Statement and Prospectus that became effective on May 10, 2011 and who were damaged thereby (the "Class"). Excluded from the Class are Kosmos, the Individual Defendants and the Underwriter Defendants, such entities' successors and assigns, the directors and officers of such entities at all relevant times, as well as the members of such persons' immediate families and their legal representatives, heirs, successors or assigns, and any entity in which any excluded party has or had a controlling interest.[9]

Though the proposed class description contains no express time limit, counsel for the Pension Plan later clarified that the "end date" would be January 10, 2012—the date the first lawsuit in this matter was filed.[10] The Pension Plan "conservatively estimates the number of Class members to be at least in the hundreds, and likely the thousands."[11]

For their part, Defendants strongly oppose class certification, arguing collectively that the Pension Plan has failed to satisfy the exacting evidentiary burdens imposed on parties seeking class certification under Fed. R. Civ. P. 23(a) and (b)(3).[12] The Defendants cite to recent Supreme Court opinions requiring courts to undertake a "rigorous" analysis of motions to certify, squarely placing

---

[9] Pl.'s Mot. 1.

[10] *See* Cert. Hrg. Tr., Doc. 129, at 23 ("The lead plaintiff is fine to have the end date to be on January 10th of 2012, which . . . [was] the date that the first complaint was filed.").

[11] Pl.'s Mot. 7 (emphasis omitted).

[12] Defs.' Resp. 1-2.

the burden to satisfy all of Rule 23's requirements on the party seeking certification.[13] In particular, Defendants take issue with Lead Plaintiff's attempts to satisfy Rule 23(a)'s *adequacy* and Rule 23(b)(3)'s *predominance* requirements, the thrust of their opposition being that Plaintiff's motion is devoid of evidentiary support and that Plaintiff has, "in essence presumed" a class will be certified.[14]

For the reasons that follow, the Court concludes that Lead Plaintiff has fallen short of the dictates of *Wal-Mart Stores, Inc., v. Dukes* and *Comcast Corp. v. Behrend*, as well as the Fifth Circuit's standard for class certification in securities cases set out in *Berger v. Compaq Computer Corp.* Instead, and to its detriment, Plaintiff has relied on pre-*Comcast* case authority, in arguing that cases filed under §§ 11, 12(a)(2), and 15 of 1933 Act, are "ideally suited for class certification" and should be presumptively favored for class treatment by courts.[15] This reasoning, however, does not square with the now-binding authority from the Supreme Court and the Fifth Circuit mentioned above, which requires evidentiary support by the moving party and entails a rigorous review by the court. Falling short of this mark, Lead Plaintiff's motion for class certification must be denied.

Because the Court's reasons for denying certification are moored closely to the evolution of the case authority on class certification, a brief review of that topic follows.

---

[13] *Id.* (citing *Wal-Mart, Inc. v. Dukes*, 131 S. Ct. 2541, 2551-52 (2011); *Comcast Corp. v. Behrend*, 133 S.Ct. 14261432 (2013)).

[14] *Id.* 1-2.

[15] Pl's Mot. 4-5 (citing *In re Constar Int'l Sec. Litig.*, 585 F.3d 774, 784-85 (3d Cir. 2009); *Gibb v. Delta Drilling Co.*, 104 F.R.D. 59, 71 (N.D. Tex. 1094) (other citations omitted)).

## II.

## CLASS CERTIFICATION

Class actions are an "'exception to the general rule" that litigation is a one-on-one undertaking.[16] Plaintiffs seeking class certification must first satisfy the requirements of Rule 23(a): numerosity, commonality, typicality, and adequacy.[17] This is not a perfunctory task; it is the plaintiffs burden to present evidence showing that "'there are *in fact* sufficiently numerous parties, common questions of law or fact,' typicality of claims or defenses, and adequacy of representation."[18]

Plaintiffs moving for class certification must also establish at least one of Rule 23(b)'s provisions. Lead Plaintiff relies on Rule 23(b)(3) in this case, which means it must show that "questions of law or fact common to class members predominate over any questions affecting individual class members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy."[19]

---

[16] *Califano v. Yamasaki,* 442 U. S. 682, 700-701 (1979).

[17] *See* FED. R. CIV. P. 23(a) ("One or more members of a class may sue or be sued as representative parties on behalf of all members only if: (1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class.").

[18] *Comcast Corp. v. Behrend,* 133 S.Ct. 1426, 1432 (2013) (quoting *Wal-Mart, Inc. v. Dukes*, 131 S. Ct. 2541, 2551-52 (2011)) (emphasis in original).

[19] FED. R. CIV. P. 23(b) ("A class action may be maintained if Rule 23(a) is satisfied and if . . . (3) the court finds that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy. The matters pertinent to these findings include: (A) the class members' interests in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already begun by or against class members; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and (D) the likely difficulties in managing a class action.").

Rule 23 itself "says nothing about whether those requirements must be satisfied by *evidence* (as opposed to merely by *pleading*.)"[20] Exactly how to meet Rule 23's standards for class certification, in the myriad factual contexts these cases are presented to the courts, has been a controversial and evolving topic among federal courts for decades. As the case authority has developed, and because the certification decision is "the defining moment in a class action," [21] it is critical for courts to determine the correct legal framework and then adhere to its contours. As such, a brief review of the case development in this area provides a helpful starting point for the Court's analysis.

A.    *Class Actions—the Law's Evolution*

As recounted by numerous commentators, after an onslaught of high-stakes class-action suits accompanied by huge monetary awards in the federal courts in the 1980s and 1990s, the class action as a procedural device began to fall into "disfavor" with the courts and certain sectors of the public.[22] Efforts ensued to curtail what courts described as the potentially "bankrupting" effect of class certification which, once granted, placed defendants "under intense pressure" to settle.[23] One such effort  by the Advisory Committee on Civil Rules resulted in the adoption of Rule 23(f), which opened the door for plaintiffs and defendants to seek interlocutory review of a district court's decision to either deny or grant class certification.[24] Another was Congress's enactment of the Class Action

---

[20] Robert H. Klonoff, The Decline of Class Actions, 90 Wash. U. Law Rev. 729, 747 (2013).

[21] *Id.* at 746.

[22] Klonoff, *supra*, at 736-39.

[23] *Id.* at 733 (quoting *In re Rhone-Poulenc Rorer Inc.*, 51 F.3d 1293, 1298 (7th Cir. 1995); *Castano v. Am. Tobacco Co.*, 84 F.3d 734, 746 (5th Cir. 1996)) (other internal citations omitted).

[24] *Id.* at 740-41.The Rule has served for the most part as a device protecting defendants, as the bulk of Rule 23(f) appeals have been taken by defendants seeking review of orders by a district courts granting class

Fairness Act with an aim toward correcting "class action abuses" occurring in many state courts by allowing major class actions to be removed to federal court.[25]

By far the most significant development in class action litigation, however, from approximately the 1990s going forward has been the steady departure by federal courts away from a presumptively favorable approach toward class certification to a more skeptical view coupled with a more exacting review process.  Courts employing the former, presumptively pro-plaintiff approach, permitted plaintiffs to obtain class-certification based solely on the pleadings or on only a modicum of evidentiary support.[26] More recently, the Supreme Court and several circuit courts, including the Fifth, have developed a body of "rigorous federal case law" interpreting Rule 23's requirements as imposing stringent standards on plaintiffs seeking class certification. This rigorous review process not only prohibits the former practice by courts of accepting the plaintiff's pleadings as "true" for purposes of the certification analysis, but also requires them to produce  actual evidence that they are entitled to class status.[27]

---

certification.

[25] *Id.* at 743-44 (citing the Class Action Fairness Act of 2005, Pub. L. No. 109-2, 119 Stat. 4 (codified in sections of 28 U.S.C.)).

[26] *Id.* at 746-47 (citing *Eisen v. Carlisle & Jaqueline*, 417 U.S. 156, 168 (1974)).

[27] *Id.* at 745-52; *see also Szabo v. Bridgeport Machines, Inc.*, 249 F.3d 672, 675-76(7th Cir. 2001) (holding that the proposition that a district court must accept all of the complaint's allegations as true when deciding certification "cannot be found in Rule 23 and has nothing to recommend it"); *In re Hydrogen Peroxide Antitrust Litigation*, 552 F. 3d 305, 307 (3d Cir. 2008) (holding that plaintiffs must make more than a mere "threshold showing," they must establish facts "by the preponderance of the evidence"); *Wal-Mart*, 131 S.Ct. at 2551-2552 ("Rule 23 does not set forth a mere pleading standard. A party seeking class certification must affirmatively demonstrate his compliance with the Rule—that is, he must be prepared to prove that there are in fact sufficiently numerous parties, common questions of law or fact, etc.").

The development toward the more rigorous approach in the Fifth Circuit can be traced to the 1996 case of *Castano v. Am. Tobacco Co.*[28] In *Castano*, the Fifth Circuit reversed a district court's order granting class certification, finding the court had misinterpreted prior authority as barring courts from looking beyond the pleadings in deciding whether the class should be certified.[29] Instead, the Circuit explained, "[g]oing beyond the pleadings is necessary, as a court must understand the claims, defenses, relevant facts, and applicable substantive law in order to make a meaningful determination of the certification issues."[30] This, in turn, the court elaborated, requires courts to examine the parties' claims as well as their evidence and to "find"—not just presume—that enough facts support class certification.[31] The Fifth Circuit's reasoning followed the Supreme Court's decision in *General Telephone v. Falcon*,[32] which held that a rigorous analysis was necessary in class certification proceedings and may necessitate a probe behind the pleadings to determine if Rule 23(a)'s strictures have been met.

The culmination of the movement by courts—away from a presumptively pro-plaintiff view to the more restrictive approach today—was most recently summed up by the Supreme Court in its 2013 opinion, *Comcast v. Behrend.*[33] In *Comcast*, the Supreme Court, re-stated—its now firmly

---

[28] 84 F.3d 734, 744 (5th Cir. 1996).

[29] *Id.* at 744 (citing *Eisen*, 417 U.S. at 168; *Miller v. Mackey, Int.'l,* 452 F.2d 424, 427 (5th Cir. 1971)).

[30] *Id.* (citing Manuel For Complex Litigation § 30.11 (3d ed. 1995)).

[31] *Madison v. Chalmette Refining, L.L.C.*, 637 F.3d 551, 555 (5th Cir. 2011) (citing *Unger v. Amedisys Inc.*, 401 F.3d 316, 321 (5th Cir. 2005); *Castano*, 84 F.3d at 740; *Amchem Products, Inc., v. Windsor*, 521 U.S. 591, 613 (1997)).

[32] 457 U.S, 147, 160-61 (1982).

[33] 133 S. Ct. 1426.

entrenched view—that a plaintiff seeking class certification "'must affirmatively demonstrates his compliance'" with Rule 23(a) by showing that "'there are *in fact* sufficiently numerous parties, common questions of law or fact,' typicality of claims or defenses, and adequacy of representation."[34] The *Comcast* court further clarified that "[t]he same analytical principles [that apply to Rule 23(a)] govern Rule 23(b)," noting in particular that "[i]f anything, Rule 23(b)(3)'s predominance requirement is even more demanding than Rule 23(a)."[35] Endorsing its view from *Wal-Mart* and *Falcon,* the Court in *Comcast* reiterated that the certification analysis "will frequently entail 'overlap with the merits of the plaintiff's underlying claim,'" as the class certification analysis "'generally involves considerations that are enmeshed in the factual and legal issues comprising the plaintiff's cause of action.'"[36]

Going forward, the clear directive to plaintiffs seeking class certification—in any type of case—is that they will face a rigorous analysis by the federal courts, will not be afforded favorable presumptions from the pleadings or otherwise and must be prepared to prove *with facts*—and by a preponderance of the evidence—their compliance with the requirements of Rule 23.

B.      *Class Certification in Securities Cases*

The foregoing guidance in hand, the Court turns to the law on class certification in the area of law this case concerns—federal securities law. Despite the clear directive that courts undertake a rigorous analysis in deciding class certification motions, these decisions are necessarily fact-

---

[34] *Id.* at 1432 (quoting *Wal-Mart*, 131 S.Ct at 2551-2552) (emphasis in original).

[35] *Id.* at 1432 (citing *Amchem*, 521 U.S. at 623-24).

[36] *Comcast*, 133 S.Ct. at 1432 (quoting *Wal-Mart*, 131 S.Ct. at 2551, which quotes *Falcon*, 102 S,Ct. at 2364), *accord Funeral Consumer's Alliance, Inc, v. Service Corp. Int'l.*, 695 F.3d 330, 346 (5th Cir. 2012).

intensive and informed by the substantive context in which they arise.[37] That said, in the securities

law setting, the Court is guided not only by the precedent described above, but also by the Private

Securities Litigation Reform Act of 1995 ("PSLRA")[38] and Fifth Circuit precedent construing the

Act's effect on the certification of securities class actions.

The PSLRA—which amended the 1933 Act and the Securities Exchange Act of 1934—was

enacted in 1995 to address a perceived increase in "abusive private securities fraud suits."[39] For

purposes of this discussion, the relevant change effected by the PSLRA on securities class actions

impacts Rule 23(a)'s *adequacy* requirement. Specifically, the PSLRA aimed to remedy "perceived

abuses in the designation of class representatives" to assure adequate class representation."[40] Toward

the end of "discourag[ing] lawyer-driven litigation and the use of 'professional plaintiffs' who . . .

allowed lawyers to file abusive securities class actions on their behalf," the PSLRA made three

significant changes to the manner in which class-action representation is to be evaluated and

controlled."[41] First, a plaintiff seeking class representative status must file a certified statement with

the complaint establishing, *inter alia*, his review and authorization of the complaint, that he did not

purchase the securities at the behest of counsel, and that he is willing to serve as the representative

party for the class.[42] Second, the PSLRA also imposed new, more stringent procedures and standards

---

[37] *Funeral Consumer's Alliance*, 695 F.3d at 346 (noting the fact-intensive nature of class certification).

[38] Pub. L. 104-67, 109 Stat. 737-65 (1995).

[39] 7B C. Wright & A. Miller, Federal Practice & Procedure § 1806 (2d ed. 2005).

[40] *Id.*

[41] *Id.*

[42] *Id.* at 424-25 (citing 15 U.S.C.A. § 77z-1(a)(2); 15 U.S.C.A. § 78u-4(a)(2)).

that must be satisfied before a lead plaintiff can be appointed in a purported class action.[43]  Third, the PSLRA altered the class action settlement process by, among other things, imposing restrictions on sealing settlement agreements and placing limitations on attorneys fees.[44]

The effect of the above-described PSLRA provisions on securities class actions has been characterized by the Fifth Circuit as "rais[ing] the standard adequacy threshold" of Rule 23(a)(4).[45] The Fifth Circuit made this statement in *Berger v. Compaq Computer Corp.*,[46] where it addressed—as a matter of first impression—the question of how the PSLRA impacted Rule 23(a)(4)'s adequacy requirement. The more specific issue before the court in *Berger* was whether the district court, in certifying the class, had applied an incorrect legal standard for adequacy under Rule 23(b)(4) by holding that "[t]he adequacy of the putative representatives . . . is presumed in the absence of specific proof to the contrary."[47] The Fifth Circuit squarely rejected this formulation of the adequacy test, characterizing it as "impermissibly lax."[48] In so doing, the court strongly emphasized that "the party seeking certification bears the burden of establishing all requirements of [Rule 23(a)] have been met," and that "it is not up to defendants to disprove [a] presumption of adequacy."[49] The Fifth Circuit explained that even before the enactment of the PSLRA, the adequacy requirement

---

[43] *Id.* at 425.

[44] *Id.* at 466-67(citing 15 U.S.C.A. § 77z-1(a)(5); 15 U.S.C.A. § 78u-4(a)(5)).

[45] *Berger v. Compaq Computer Corp.*, 257 F.3d 475, 483 (5th Cir. 2001).

[46] *Id.* at 483-85.

[47] *Id.* at 480-82.

[48] *Id.* at 480 n. 7, 481.

[49] *Id.* at 481 (citing *Castano*, 84 F.3d at 740).

mandated a showing that the representative would "vigorously prosecute" the case on behalf of the class and mandated an inquiry into the "'willingness and ability of the representatives to take an active role in and control the litigation and protect the interests of the absentees.'"[50]

Against that backdrop of settled authority in the Fifth Circuit, the court addressed the question of "whether, and to what extent," the PSLRA affected the standard, mindful that it had previously "called for Rule 23 to be interpreted to accommodate the substantive policies of the governing statute."[51] The *Berger* court answered that question as follows:

> Any lingering uncertainty, with respect to the adequacy standard in securities fraud class actions, has been conclusively resolved by the PSLRA's requirement that securities class actions be managed by active, able class representatives who are informed and can demonstrate they are directing the litigation. In this way, the PSLRA raises the standard adequacy threshold. . . .
> . . .
> [I]t follows that in complex class action securities cases governed by the PSLRA, the adequacy standard must reflect the governing principles of the Act and, particularly, Congress's emphatic command that competent plaintiffs, rather than lawyers, direct such cases. Accordingly, to the extent that the district court's adequacy analysis failed to assess the representatives' own qualifications "to take an active role in and control the litigation," the court departed from the correct legal standard.
> . . .
> Class action lawsuits are intended to serve as a vehicle for capable, committed advocates to pursue the goals of the class members through counsel, not for capable, committed counsel to pursue their own goals through those class members.[52]

To be clear, *Berger*'s holding that the PSLRA raised the adequacy threshold did "not creat[e] an additional requirement under Rule 23(a)(4)" beyond the Rule's "'long-established standards for

---

[50] *Id.* at 482-83 (internal citations omitted).

[51] *Id.* at 483.

[52] *Id.* at 483-85.

[Rule 23] adequacy.'"[53] Nonetheless, the take-away lesson from *Berger* remains clear: courts deciding class certification motions in *securities* cases[54] must take into account "Congress's emphatic command" in the PSLRA and ensure that class representatives are informed, able individuals who are themselves—and not the lawyers—actually directing the litigation.[55] Several district courts in the Fifth Circuit and outside the Circuit have adhered to *Berger's* approach to determining adequacy, citing the case with approval.[56]

## III.

## THE PARTIES' ARGUMENTS

Given this evolving body of law, and its somewhat uncertain application in this case, the Court begins its analysis of the available facts with a review of the parties' central arguments. The Court limits its review to the two most hotly disputed certification elements in this case: the Pension Plan's *adequacy* under Rule 23(a) and predominance under Rule 23(b).[57] In doing so, the Court pays

---

[53] *Feder v. Electronic Data Systems*, 429 F,3d 125,129-30 (5th Cir. 2005)(citing *Berger*, 257 F.3d at 483; *Berger v. Compaq Computer Corp.*, 279 F.3d 313, 313-14 (5th Cir. 2002)).

[54] Some districts courts in the Fifth Circuit have applied *Berger* outside of the securities context. *See Ogden v. AmeriCredit Corp.*, 225 F.R.D. 529, 532 n. 2 (N. D. Tex. 2005)(purported ERISA class action, court did apply *Berger*)*; but See In re Heartland Payment Systems, Inc. Customer Data Sec. Breach Litigation*, 851 F.Supp.2d 1040, 1056-57, n.12 (S.D. Tex. 2009)(consumer class action, court did not apply *Berger*)). Given that this is a securities case, whether *Berger* applies outside of securities cases is not relevant to this analysis.

[55] *Berger*, 257 F.3d at 484.

[56] *See Feder*, 429 F.3d at 129-30; *Unger v. Amedisys Inc.*, 401 F.3d 316, 321 (5th Cir. 2005); *Baricuatro v. Ind. Personnell & Mgmt Servs., Inc.*, No. 11-2777, 2012 WL 5472302 at * 7-8 (E.D. La. Nov. 9, 2012); *Shiring v. Tier Technologies, Inc.*, 244 F.R.D. 307, 315-17 (E.D. Va. 2007); *Ogden v. AmeriCredit Corp.*, 225 F.R.D. 529, 533-34 (N. D. Tex. 2005); *Umsted v. Intelect Comms.*, Inc., Civil Action No. 3:99–CV-2604-M, 2003 WL 79750 (N.D. Tex. 2003); *Krim v. pcOrder.com. Inc.*, 210 F.R.D. 581, 587 (W.D. Tex. 2002).

[57] The numerosity and commonality requirements under Rule 23(a) are not in dispute. *See* Joint Statement of Stipulated & Disputed Facts, Doc. 128. Defendants also concede that Robbins Geller is an adequate class counsel. *Id.* While Defendants contest typicality under Rule 23(a) and superiority under Rule

13

particular attention to what, if any, factual support Lead Plaintiff submits to satisfy the evidentiary burden placed on it through cases such as *Berger*, *Wal-Mart*, and *Comcast*.

A.      *Lead Plaintiff's Arguments for Class Certification*

As mentioned in the introduction, the Pension Plan moves to certify a plaintiff class of persons and entities who were allegedly damaged by purchasing or otherwise acquiring common stock "pursuant to or traceable to" Kosmos' IPO on May 10, 2011.[58]

Lead Plaintiff's general position here, for each Rule 23 element, is that the law favors certification in this context and places a minimal evidentiary burden on plaintiffs at this stage of the proceedings. For example, the Pension Plan reasons that "as is typical in cases alleging securities law violations, the four requirements of Rule 23(a)—numerosity, commonality, typicality, and adequacy—have been met here," and for similar reasons, "the predominance and superiority prongs . . . have also been fulfilled."[59] In an effort to support its legal arguments with facts, the Plan submits a 100-page appendix, the bulk of which is made up of Robbins Geller's eighty-eight page firm resume. In short, the Pension Plan relies almost exclusively on its pleadings and legal arguments, because, in its view, this is the sort of case that "is ideally suited for class certification under Rule 23."[60]

1.      Lead Plaintiff's Position on Adequacy under Rule 23(a)(1)

The Pension Plan maintains that it is a more than adequate class representative. First, the

---

23(b)(3), they never expressly address these elements in their brief, although they noted at the hearing that these elements fail for essentially the same reasons the predominance element is not met.

[58] Pl.'s Mot. 1.

[59] *Id.* at 2.

[60] *Id.* at 4.

Plan asserts that there are no conflicts of interest because its interests are "directly aligned with those of the proposed [c]lass."[61] Also along those lines, the Plan points out that and the putative class members all "purchased Kosmos stock pursuant to the Offering Documents" and, therefore, "share the common goal" of proving that the Defendants "issued false and misleading statements and omissions" in connection with the IPO and seeking recovery of money damages for their losses.[62]

In further support of its adequacy, Lead Plaintiff argues, *inter alia*, that it has demonstrated its "commitment to [vigorously] directing this action on behalf of the [c]lass," through its familiarity the facts of the and issues of the case, its participation in strategic case-decision making, and by its active involvement in the discovery process.[63] In support of this portion of its adequacy argument, the Pension Plan submits a roughly two page Declaration of its Board Chair, Suzanne Saville, the text of which is set forth in the footnote below.[64]

---

[61] *Id.* at 10.

[62] *Id.* at 11.

[63] *Id.*

[64] Saville's Declaration (App. to Pl.'s Mot. 98-99) reads as follows:
I, Suzanne Saville, declare as follows:.
    1. I respectfully submit this declaration in support of Lead Plaintiffs Motion for Class Certification. I have personal knowledge of the statements herein and, if called upon as a witness, could and would competently testify thereto.
    2. I am the Chair of the Board of Trustees of the Nursing Homes and Related Industries Pension Plan ("the Plan"), Lead Plaintiff in this action. I have participated in the Plan's decision making with respect to litigation matters, and have participated in supervising outside legal counsel in the Plan's pending litigation. As Chair of the Board of Trustees of the Plan, I am authorized to seek the Plan's appointment as Class Representative in this action.
    3. The Plan is a target-benefit, multi-employer pension plan. As of January 31, 2013, the Plan had 437 contributing employers, nearly 50,000 members, more than 6,000 retirees, and more than $1 billion in assets. According to its records, the Plan purchased 72,600 shares of Kosmos common stock on May 10, 2011. *See* Appendix of Exhibits in Support of the Plan's Opposition to the Competing Motions for Appointment as Lead Plaintiff, Ex. 1 (Dkt. No. 62-1).
    4. The Plan understands that the Private Securities Litigation Reform Act of 1995 was

2.    Lead Plaintiff's Position on Predominance under Rule 23(b)(3)

To show that common questions of law and fact predominate under Rule 23(b)(3), Lead Plaintiff relies largely upon its briefing to make its point. In fact, the Pension Plan never once points to evidentiary materials to support its predominance argument, referring exclusively to legal authorities and the parties' pleadings.[65]

---

intended to encourage institutional investors to seek to direct securities class actions. The Plan is an institutional investor committed to vigorously prosecuting this litigation. The Plan intends to obtain the largest recovery for the class consistent with good faith and sound judgment.

5. The Plan has reviewed and monitored the progress of this litigation and has actively participated in its prosecution. For example, the Plan has: (a) received and reviewed periodic updates and other correspondence from plaintiffs' counsel, (b) supervised Plan representatives who preserved materials for potential discovery, (c) reviewed pleadings and other documents in the case, and (d) consulted with its lawyers regarding significant developments and strategic decisions in this litigation. For example, after this Court issued its Memorandum Opinion and Order (Dkt. No. 1 05) 875134_1 A098 Case 3:12-cv-00373-B Document 120 Filed 10/03/13 Page 100 of 106 Page ID 1549granting in part and denying in part defendants' motions to dismiss the Consolidated Complaint (Dkt. No. 71), the Plan consulted with its lawyers to consider amending the Consolidated Complaint. After considering the risks, costs and benefits of amendment, the Plan elected to forego amendment and press forward with the remaining claims. This decision was made by the Plan for the purpose of maximizing the Class's recovery in an efficient manner.

6. The Plan is committed to continuing to direct this litigation and maximize the Class's recovery by attending hearings, depositions and (if necessary) trial, and by overseeing the Plan's lawyers as appropriate. Further, the Plan understands that it owes a fiduciary duty to all members of the proposed Class to provide fair and adequate representation, and intends to continue to work with its lawyers to obtain the largest possible recovery for the Class consistent with good faith and meritorious advocacy.

7. The Plan intends to continue to provide fair and adequate representation by, among other things, participating in the litigation as needed and directing the efforts of its selected counsel, Robbins Geller Rudman & Dowd LLP ("Robbins Geller"). The Plan selected Robbins Geller as its counsel based on the firm's substantial experience and expertise in prosecuting securities class actions. In addition, the Plan believes Robbins Geller possesses the necessary financial and human resources to continue prosecuting this case effectively.

8. I will remain informed at all times concerning the status and progress of this action, the strengths and weaknesses of the case, and the prospects for settlement. I will consult with counsel in advance with respect to each major litigation event, such as important motions, settlement discussions, trial preparation and trial. I recognize that the Plan owes a fiduciary duty to the proposed Class, and if appointed as Class Representative, the Plan will take all steps necessary to vigorously fulfill that duty.

[65] *See* Pl.'s Mot. 12-17.

Lead Plaintiff's argument begins with its assertion that the law here is that "predominance generally exists where a plaintiff alleges Securities Act violations by defendants on behalf of a proposed investor class."[66] It then argues that "[t]he predominant issue in this litigation is defendants' liability."[67] The Plan explains that the proof as to liability will center on the common issue of "materiality" of the statements/omissions in the Offering Documents. Because establishing liability will entail "common proof" of the Defendants' alleged false statements, the Pension Plan reasons, "common questions of law and fact overwhelmingly predominate over individual questions."[68] Other areas of common proof the Pension Plan refers to include whether certain defendants acted as "control persons under § 15 of the Securities Act."[69] Lead Plaintiff also submits that both Defendants' affirmative defense of "negative loss causation" as well as the Plan's class damages, which it maintains "are readily calculable according to the common formulae . . . in §§ 11(e) and 12(a)(2) of the Securities Act," establish predominance under Rule 23(b)(3).[70]

B.    *Defendants' Opposition to Class Certification*

Defendants strongly oppose class certification and hotly dispute that Lead Plaintiff has satisfied its stringent evidentiary burden under Rule 23, complaining that the Plan simply "presumes" a class will be certified.[71]   While Defendants argue that the Plan has fallen short of proving most of

---

[66] *Id.* at 12.

[67] *Id.* at 13.

[68] *Id.*

[69] *Id.* at 14.

[70] *Id.* at 14-15 (citing 15 U.S.C. §§ 77k(e), 77l(b), 77l(a)(2)).

[71] Defs.' Resp. at 1-2 (citing *Wal-Mart*, 131 S.Ct. at 2551-52 and *Comcast*, 133 S.Ct. at 1432).

Rule 23's elements, the crux of their opposition is that Lead Plaintiff has wholly failed to meet its evidentiary burden as to Rule 23(a)(1)'s adequacy and Rule (b)(3)'s predominance provisions.

### 1. Defendants' Position on Adequacy under Rule 23(a)(1)

At the heart of Defendants' opposition to the Plan's request to be appointed class representative is their assertion that there is a fatal absence of evidentiary support for the Plan's request. More to the point, Defendants maintain, a purported class representative must demonstrate that it possesses "'a sufficient level of knowledge and understanding'" to be able to control the litigation,[72] that potential representative must also establish that it—not the lawyers—is directing the litigation and that it is not only sufficiently informed about the case to properly manage the effort, but that it must also be "willing and able to take an active role and protect the interests of absentee class members."[73]

Defendants assert that Lead Plaintiff falls far short of satisfying this stringent standard for adequacy. They point out that the Plan offers "little, if any, evidence" to prove its adequacy to as class representative. For their part, Defendants submit the deposition transcript of the Plan's Board Chair Ms. Saville, which was taken in conjunction with the certification proceedings. Saville's deposition, Defendants claim, establishes that the Plan "has virtually no knowledge about the case,"[74] and in fact, "does not understand [the Plan's] own allegations" or the "core themes permeating the

---

[72] *Id.* at 5 (quoting *Berger*, 257 F.3d at 482-83).

[73] *Id.* at 7 (quoting *Heartland Payment Sys.*, 851 F. Supp 2d at 1055 and *Altier v. Worley Catastrophe Response, LLC*, No. 11-242, 2011 WL 3205229 at *10 (E.D. La. Jul. 26, 2011)).

[74] *Id.* at 7 -8 (citing Saville Deposition, Appx. to Defs.' Resp.).

litigation."[75] Further, Defendants point to portions of Saville's deposition which they assert shows

that she had never seen, "much less read," the Registration Statement, nor could she identify a single

misstatement in it, was unable to recognize the names of certain defendants, and was either confused

or did not know whether the Kosmos stock price dropped, or if it did, what might have caused the

drop, after the Plan purchased the stock.[76]

<u>2.</u>     <u>Defendants' Position on Predominance under Rule 23(b)(3)</u>

The Defendants' other primary objection to class certification centers on predominance

under Rule 23(b)(3), arguing that "[i]ndividualized issues of investor knowledge render Plaintiff

incapable of satisfying the predominance standard in this case."[77] More precisely, Defendants posit

that Dr. Glenn Hubbard's Expert Report—which Defendants offer in support—shows that

information about production problems at the Jubilee Field was publicly disclosed during the putative

class period on at least fourteen occasions via conference calls or press releases.[78] Due to the multiple

public disclosure of production problems at the Jubilee Field during the putative class period, the

Defendants urge, the critical question of which investors knew what about the production problems

at the time they purchased Kosmos' common stock defies uniform treatment and is, therefore, fatal

to a finding of predominance.[79] Defendants further fault Lead Plaintiff for failing to offer any

evidence to "prove a uniform lack of knowledge common to all class members" which is needed, in

---

[75] *Id.* at 8.

[76] *Id.*

[77] *Id.* at 9.

[78] *Id.* at 10-11 (citing Hubbard Decl. ¶ 26, Appx. to Defs.' Resp.).

[79] *Id.* at 9-11.

their view, for a showing of predominance.[80] Consequently, Defendants predict, the issue of investor knowledge will "devolve into hundreds of mini-trials." [81]

Lastly,[82] Defendants contest the Plan's ability to establish a class-wide method for measuring damages that is consistent with the Lead Plaintiff's theory of liability.[83] Relying on the specifics of *Comcast*, Defendants argue that the Plan fails to offer a damages model susceptible of "measurement across the entire class for purposes of Rule 23(b)(3)," which dooms its ability to show predominance on this issue.[84] Here, the Defendants maintain, the Plan "has not even offered a damage methodology, much less one that ties to the Plaintiff's theory of liability."[85]

## IV.

## ANALYSIS

As discussed, Lead Plaintiff bears the burden of establishing all four general class certification elements under Rule 23(a) and the two additional certification requirements under Rule 23(b)(3). Below, the Court examines whether the Plan has satisfied its burden for the two elements central to this dispute—Lead Plaintiff's adequacy under Rule 23(a)(1) and predominance under Rule 23(b)(3).

A.    *Adequacy*

1.    Adequacy Doctrine: Scrutinizing Class Representatives to Uphold Due Process

---

[80] *Id.* at 12.

[81] *Id.*

[82] Defendants also raise issues related to the breadth of the proposed class definition, which the Court does not address in its analysis.

[83] *Id.* at 13.

[84] *Id.* (quoting *In re Rail Freight Fuel Surcharge Litig.*, 725 F.3d 244, 252 (D.C. Cir. 2013)).

[85] *Id.*

Adequacy is a constitutional prerequisite to class certification. In fact, it has been said that, "[d]ue process issues are the single most important feature of class litigation, and adequacy looms over the entire debate."[86] As the adequacy doctrine developed after the Supreme Court's 1940 opinion in *Hansberry v. Lee*,[87] and the precise contours of the requirement were left to the lower courts, a patchwork of case law emerged that lacked uniformity and provided no discernable standard of proof for the requirement.[88] Some courts presumptively favored finding class representatives adequate, requiring little or no evidence to support the determination.[89] Others employed a more robust review of the issue, incorporating the due process considerations inherent in the concept, making certain that the representative possessed the character traits necessary to guarantee his commitment to his fiduciary duties to the class.[90]

As discussed before, the latter, more stringent of these approaches was endorsed by the Fifth Circuit's opinion in *Berger*, which, now flanked by the Supreme Court's recent decisions in *Wal-Mart* and *Comcast*, leaves no doubt that plaintiffs can no longer rely upon the lax adequacy standards employed at times in the past. Instead, plaintiffs seeking certification must produce actual, credible evidence that the proposed class representatives are informed, able individuals, who are

---

[86]*See* Linda S. Mullinex, Taking Adequacy Seriously: The Inadequate Assessment of Adequacy in Litigation and Settlement Class Actions, 57 Vand. L. Rev. 1687, 1696 (2004) ("[T]he core issue of adequacy has moved to center stage in the ongoing debate over class action jurisprudence.").

[87] 311 U.S. 32 (1940).

[88] *Berger*, 257 F.3d at 480 n. 7(citing *Hansberry* and Wright & Miller, *supra*, § 1765).

[89] *See* Mullinex, *supra*, at 1691-92 (describing federal court practices for determining adequacy as paying only "lip service" to the adequacy concept, "the least-rigorously examined requirement for certification").

[90] *Id.* at 1704-05 (internal citations omitted); *see also* Wright & Miller, *supra*, § 1765.

themselves—not the lawyers—actually directing the litigation.[91]

Applying this rigorous adequacy review—in practice—involves consideration of a number of factors. For example, courts often consider the proposed representative's personal attributes, including evidence of the representative's character, honesty, and conscientiousness.[92] The representative's familiarity with the case is also important. Certification may be denied where the representative lacks knowledge or a basic understanding of "what the suit is about."[93] Likewise, evidence of the representative's willingness or ability to participate in the litigation is relevant. When it appears that the potential representatives are "simply lending their names to a suit controlled entirely by the class attorney,"[94] or where the representative is too "closely affiliated with class counsel,"[95] courts may find them to be inadequate. Failing to appear at the class certification hearing has also been considered a negative factor in the adequacy assessment.[96]

It is also important to note that the *form* in which this information about the representative is presented to the court often affects its evidentiary value to the court. For example, deposition testimony of the proposed representative—where the party opposing certification was able to question the individual in person—may trump a written, sworn statement by that representative.

---

[91] *Berger*, 257 F.3d at 484.

[92] Wright & Miller, *supra*, § 1766.

[93] *Krim v. Lacy*, 210 F.R.D. 581, 587 (W.D. Tex. 2002) ("An adequate class representative should have 'commendable familiarity with the complaint and the concept of a class action.'")

[94] *Butterworth v. Quick & Reilly, Inc.*, 171 F.R.D. 319, 322 (M.D. Fla. 1997) (quoting *Kirkpatrick v. J. C. Bradford & Co.*, 827 F.2d 718, 728 (11th Cir. 1987)).

[95] *See Mullinex*, *supra*, at 1705.

[96] *Ogden v. Americredit Corp.*, 225 F.R.D. 529, 532-33 (N.D. Tex. 2005); *Umsted v. Intelect Comms.*, Inc., Civil Action No. 3:99–CV-2604-M, 2003 WL 79750 at * 2 (N.D. Tex. 2003).

Applying these principles, the district court in *In re Enron Corp. Securities*[97] found a group of six potential class representatives to be inadequate based on a number of factors. Reviewing the deposition testimony of the prospective representatives, the court found significant the fact that the representatives had "nearly total if not complete reliance on class counsel . . . for investigation and prosecution of the case," and further, had relied on the complaints—prepared solely by class counsel—as their source of information about the facts in the case.[98] According to the court, "the amount of time these six individuals stated they spent" reviewing the complaints in *Enron*, "was nowhere near the time a meaningful review would require," as the representatives conceded they only skimmed the pages.[99] Further, the representatives' failure to identify certain named parties or the roles the defendants played in the alleged fraud and inability to articulate any underlying case specifics "beyond conclusory allegations of fraud" were also considered fatal to a finding of adequacy in *Enron*.[100] The court summarized that the representatives essentially knew nothing more "that they were 'involved in a bad business deal,'" which is not enough for adequacy.[101]

Lastly, it bears repeating that in securities law cases—like here—*Berger* requires that the adequacy analysis to be "particularly searching,"[102] and holds that "[a]dequacy is for the plaintiffs to

---

[97] 529 F. Supp.2d 644 (S.D. Tex. 2006).

[98] *Id.* at 732-33.

[99] *Id.* at 733.

[100] *Id.*

[101] *Id.* (quoting *Feder*, 429 F.3d at 132, which quotes *Berger*, 257, F.3d at 483).

[102] *Shiring,* 244 F.R.D. at 315.

23

demonstrate; it is not up to defendants to disprove the presumption of adequacy."[103]

>    2.    Analyzing Adequacy: Has Lead Plaintiff Satisfied its Burden?

>        i.    *Lead Plaintiff's Minimal Proof of Adequacy: the Saville Declaration*

The only evidence[104] submitted by the Pension Plan in support of its claims of adequacy is the Declaration of its Board Chair, Suzanne Saville. The Declaration, set out in its entirety above, contains little more than formulaic, boiler-plate assertions over two pages of substantive text. Upon review, the Court finds that this written submission, presented to the Court through Lead Plaintiff's counsel—and not subject to cross-examination—carries little weight.

To elaborate, the Saville Declaration makes a number of conclusory pronouncements, such as the following: "I have participated in the Plan's decision-making with respect to litigation matters, and have participated in supervising outside legal counsel in the Plan's pending litigation."[105] The Declaration's explanation as to *how* Saville is actually participating in decision-making and supervising counsel is scant at best. In paragraph five—the paragraph containing the most detail in the eight paragraph sworn statement—the Declaration claims that Saville "received and reviewed" reports and correspondence, "supervised" discovery preservation, "reviewed pleadings" and "consulted with lawyers."[106] But this type of generic detail is really no detail at all, for it provides naught by which to assess Saville's credibility, her knowledge about the underlying facts of the case, or how

---

[103] *Berger*, 257 F.3d at 481.

[104] In their Reply, the Plan, for the first time, offers evidence in the form of excerpts of the Saville deposition, submitted in its entirety by Defendants, which it claims support its argument that it is knowledgeable about the case, familiar with its responsibilities and active in the litigation. Pl.'s Reply at 2-3.

[105] Saville Decl. ¶ 2.

[106] *Id*. ¶ 5.

much of what she has stated may have been prompted by counsel. Indeed, *any* potential class representative in *any* securities case could make almost identical assertions.

While this sort of generalized detail found in the Declaration may have sufficed for the Court's initial choice as to the appropriate Lead Plaintiff, it falls far short of satisfying the more stringent requirements for assessing the adequacy of the Pension Plan to be the Class Representative.[107] To credit it—with its dearth of supporting facts—would be to engage in the type of pro-plaintiff presumptions prohibited by the Fifth Circuit in *Berger*.[108] Thus, the Court finds the Saville Declaration—the Plan's sole piece of evidence here—fails to demonstrate adequacy.

        ii.       *Defendants' proof of Lead Plaintiff's inadequacy: Saville's deposition*

As described above, Defendants support their opposition to Lead Plaintiff's adequacy by presenting evidence in the form of the deposition of Suzanne Saville. The Saville deposition, they claim, establishes that the Plan "has virtually no knowledge about the case" and "does not understand its own allegations" or the "core themes permeating the litigation."[109]

As Defendants point out, the deposition transcript shows that the Pension Plan's representative, Ms. Saville, has never even seen the Registration Statement, the central document in this case.[110] Since Saville had never seen the Registration Statement, when asked if she could

---

[107] *Gluck v. Cellstar Corporation, et al.*, 976 F. Supp. 542, 546 (N.D. Tex. 1997).

[108] *See* Mullinex, *supra*, at 1709-12 (criticizing courts finding adequacy on the basis of "paper submission[s]" consisting of "conclusory recitations and self-serving statements, often copied from the pleadings, that the class representatives are adequate").

[109] *Id.* at 7-8.

[110] *See* Saville Deposition at 21 (Saville, upon being shown the Registration Statement and asked if she was familiar with it, responded "No." After being given an opportunity to familiarize herself with it, Saville is then asked whether she had "ever reviewed" the document before, to which she responds "I have never

point to any false statements in the document, she testified "I don't know the contents of the document. No, I can't point you to anything in this document."[111] Similarly, Saville could not recognize the name of certain defendants the Pension Plan is suing in this case.[112] Saville's deposition also demonstrates that she did not know whether the Kosmos stock price had in fact dropped after the Plan purchased it, and after being told that it had dropped, she testified that she did not know what might have caused the price of the purchased stock to decline.[113]

Notably, Lead Plaintiff did not utilize Saville's deposition testimony as evidentiary support in its initial motion for certification, even though its counsel was present at the deposition and participated in the questioning. In addressing Saville's deposition for the first time in its reply brief, Lead Plaintiff focuses on its view of the shortcomings of Defendants' arguments. For example, the Plan discounts Defendants' position that the deposition shows Saville's lack of knowledge about the facts of the case as nothing more than Defendants' undue reliance upon "a few isolated, out-of-context excerpts," and as an example of the Defendants "ignor[ing] substantial portions of the transcript that unquestionably show the Plan's familiarity with and control over all material aspects of the litigation."[114] Lead Plaintiff further faults Defendants' assessment that Saville is uninformed about the underlying facts of the case as partly due—in the Plan's view—to Defendants' failure to

---

seen this document.").

[111] *Id.* at 22.

[112] *Id.* at 13-14.

[113] *Id.* at 88-89, 98-99.

[114] Pl.'s Reply 2.

show her the Consolidated Complaint while questioning her at the deposition.[115] Its logic apparently being that Defendants should have—but did not—show Saville the document containing the factual underpinnings of the case to credibly challenge her grasp of basic facts. This, of course, ignores the fact that Lead Plaintiff's counsel, likewise, was at the deposition and could have shown Saville this key document, but did not.

Lead Plaintiff also dismisses Defendants' assertion that Saville's failure to recognize the Registration Statement renders her an inadequate class representative. More specifically, but oddly relying upon cases *outside* of the adequacy context, the Plan maintains that because Sections 11 and 12(a)(2) of the 1933 Securities Act do not require that a plaintiff read or even be familiar with the Registration Statement, Saville's ignorance about the contents of Registration Statement has no bearing upon the Plan's adequacy to be Class Representative.[116] But none of the cases cited by the Plan support much less address this "red herring" legal proposition. In fact, these cases do not even address adequacy in this context. Submitting this inapposite authority for a legal proposition it does not support detracts from the Plan's already weak legal position on adequacy.

Finally, what few portions of Saville's deposition the Pension Plan does refer to for support of its adequacy argument contain the same type of conclusory pronouncements found in Saville's Declaration.[117] Ultimately, to defend against the shortcomings of Saville's deposition testimony, the

---

[115] *Id.* at 1.

[116] *Id.* at 4 (citing *Gustafson v. Alloyd Co.*, 513 U.S. 561, 576 (1995) and *Shores v. Sklar*, 647 F. 2d 462, 470 n.7 (5th Cir. 1981)).

[117] For example, Plead laintiff points to Saville's testimony that "Kosmos Energy . . . commenced oil production at Jubilee Field in 2010 [and] . . . put out their prospectus in . . . 2011, I think around May," as evidence that Savile demonstrated the Plan's knowledge about the case. Pl.'s Reply 2. The Plan also refers to Saville's testimony that the Plan "direct[s] the action towards the case. We keep informed of all

Plan returns to the Saville Declaration and concludes with the following vague assertions:

> Defendants do not dispute the Plan: has "participated in decision-making with respect to litigation matters and supervising outside legal counsel" [Saville Declaration]; "is an institutional investor committed to vigorously prosecuting this litigation" (*id.*); has regularly "consulted with its lawyers regarding significant developments" in the case (*id.*); has made specific strategic decisions during the course of the litigation, reviewed court filings, and supervised discovery (*id.* at A098-A099); seeks to maximize the Class's recovery (*id.* at A098); and understands its duties to absent Class members (*id.*). *See also* Response App. at 6; Reply App. at A10-A13. There is no question Ms. Saville, on behalf of Lead Plaintiff, traveled to Dallas from her home in Canada to sit for the Rule 30(b)(6) deposition notified by defendants. Lead Plaintiff has shown it will serve as an adequate Class Representative under Rule 23(a) . . . .[129]

> iv. *Lead Plaintiffs minimal efforts to prove adequacy fall short of its burden under Fifth Circuit and Supreme Court precedent*

Lead Plaintiff's defense of the Saville deposition falls short—as did its reliance on her Declaration as favorable substantive evidence—for several reasons. The Plan points to nothing in the Saville deposition that salvages its inadequate showing at the outset with the Saville Declaration. As discussed above, the Saville Declaration—the sole evidence the Plan initially relied on to support its certification motion—provides scant factual detail. Without facts to support its position, the Plan fails the rigorous test posed by *Berger*, *Wal-Mart* and *Comcast*. Moreover, when focusing on the factors listed above that courts have examined in assessing adequacy, (e.g. close affiliation with and dependence upon class counsel, knowledge of the basic facts of the case and defendants involved, desire to vigorously prosecute the case, among others), the Saville deposition testimony introduced by Defendants trounces the Plan on adequacy on several fronts, as follows.

From Saville's deposition testimony, a strong inference can be drawn that the Plan and

---

proceedings that are discussed, also, with our legal counsel from [the Plan]. We want to pursue, to be reimbursed for all our losses." *Id.*

[129]*Id.* at 5 (internal brackets, ellipses, and other alterations omitted).

Robbins Geller—Lead Counsel here, and now seeking to be appointed Class Counsel—maintain the type of close affiliation that calls into question whether the Plan or its counsel is the one actually pursuing the case. Saville conceded in her deposition that all of the documents she reviewed in preparation for the deposition were provided to her by counsel.[130] And not only was she unsure about whether Kosmos' stock had dropped after the Plan purchased it or what might have caused it to drop—pretty much the key factual underpinning of the case—she testified that it was Robbins Geller who first informed the Plan it had been damaged.[131] In fact, Saville described Robbins Geller as the Plan's "securities monitoring service."[132] As its exclusive securities monitoring service,[133] Robbins Geller monitors the Plan's securities investments for "wrongdoing[] [or] fraud" and provides a report to the Plan's legal counsel if it finds any such activity, according to Seville.[134] This monitoring service, Saville explained, is provided by the firm free of cost; Robbins Geller, in turn, is designated to represent the Plan if suit is filed, thereby recouping its costs through the successful prosecution of the securities fraud case in the courts.[135]

This type of free securities monitoring service that Robbins Geller provides the Plan has been criticized by other courts as "foster[ing] the very tendencies toward lawyer-driven litigation that the PSLRA was designed to curtail," as it "creates a clear incentive for [the securities monitoring law

---

[130] Saville Deposition at 9-10.

[131] *Id.* at 15-16, 88-89.

[132] *Id.* at 16.

[133] *See id.* at 84 (testimony from Saville that Robbins Geller is the only securities monitoring service used by the Plan).

[134] *Id.* at 17-18.

[135] *Id.* at 18-19.

firm] to discover 'fraud' in the investments it monitors and to recommend . . . that [the client],at no cost to itself, bring a class action lawsuit."[136] Further, the exclusivity of the Plan's and Robbins Geller's relationship makes this securities monitoring set-up even more significant, because the potential for a conflict of interest is greater where the monitoring firm "is guaranteed to bring the potential lawsuit."[137] In short, the fact that Robbins Geller is the Plan's sole securities monitoring service and has, in turn, filed this suit and is now seeking appointment as Class Counsel, may not dispositive on the issue of whether the Plan would be an adequate Class Representative, but it strongly suggests that this is a lawyer and not a client-driven suit.

When, this factor is considered in connection with other factors, however, the Plan's adequacy to be Class Representative is called into serious question. For example, Saville displayed a dismaying lack of knowledge and understanding regarding crucial matters in this case during her deposition, including her failure to recognize the name of certain Defendants, her inability to recall whether Kosmos's stock dropped at all, her lack of understanding as to what caused Kosmos's stock to drop, and the fact that she had never even seen, much less read, the Registration Statement, which essentially serves as the suit's cornerstone. Add to that, Saville's testimony regarding paragraph six of her Declaration—the paragraph purportedly showing the Plan's dedication to and understanding of its fiduciary duty owed to the proposed class.[138] Saville testified that she not only

---

[136] *Iron Workers Local No. 25 Pension Fund v. Credit Based Asset Serv. And Securitization, LLC,* 616 F.Supp.2d 461, 464 (S.D.N.Y. 2009).

[137] *In re Gen. Elec. Sec. Litig.,* No. 09-Civ. 1951 (DC) WL 2259502 at *6 n. 4 (S.D.N.Y. July 29, 2009).

[138] *See* Saville Decl. ¶ 6 ("[T]he Plan understands it owes a fiduciary duty to all members of the proposed Class to provide fair and adequate representation, and intends to continue to work with its lawyers to obtain the largest possible recovery for the Class consistent with good faith and meritorious advocacy.").

did *not* write that paragraph—which, along with the rest of her Declaration, was submitted to the Court through Lead Plaintiff's counsel—but that she had "no idea who wrote [it]."[139]

Moreover, Saville did not attend the class certification hearing held by this Court in December and recently sought permission to be excused from attending court-ordered mediation in person, citing the arduous burden placed on her if forced to travel to mediation in California from her home in Canada.[140] These facts indicate that the Plan lacks the incentive needed to fulfill its fiduciary duties and vigorously prosecute the claims filed on behalf of "likely thousands" of potential class members who do not have the opportunity to represent themselves here in court.

In the end, Lead Plaintiff has simply failed to meet its burden to bring forth facts that establish adequacy as mandated by controlling precedent. Ultimately, the Plan's fatal mistake was that it apparently presumed its task here is lessened because of the securities law provisions under which this case is filed. Such reasoning is ill-founded, however, because it ignores the lessons of *Berger* that adequacy is the plaintiff's burden to prove—not the defendant's burden to disprove. It also disregards the fundamental lessons of *Wal-Mart* and *Comcast*, which require the Court to engage in a rigorous analysis of a plaintiff's class certification evidence and make for distinctions based on the statutory underpinnings of the case. Simply put, the Plan's minimal evidence of its adequacy—consisting entirely of a written sworn statement replete with boiler-plate assertions admittedly composed, at least in part, by an unnamed author—does not accomplish the task.

B.      *Predominance*

While Lead Plaintiff's failure to show adequacy is enough—standing alone—to deny

---

[139] Saville Deposition at 60.

[140] Pl.'s Mot. to Amend Mediation Order, Doc. 134.

certification, the Defendants also challenge the Plan's certification motion on the predominance element of Rule 23(b)(3).

### 1.    Predominance's Demanding Legal Standard under Rule 23(b)(3)

The predominance element of Rule 23(b)(3) requires that "questions of law or fact common to class members predominate over any questions affecting only individual members."[141] For the class-wide matters to predominate, the "common issues must constitute a significant part of the individual cases."[142] Further, the factual and legal issues must be capable of determination "on a class-wide basis using class-wide proof."[143]

Like the elements of Rule 23(a), the plaintiff bears the burden of producing evidence that "affirmatively demonstrates his compliance" with Rule 23(b)(3)'s predominance requirement.[144] But that burden, according to the Supreme Court and Fifth Circuit, "'is far more demanding'" for predominance under Rule 23(b)(3) than it is for Rule 23(a)'s elements.[145] Indeed, the Supreme Court most recently noted in *Comcast* that while Rule 23(a) and (b) are governed by "[t]he same analytical principles[,] . . . Rule 23(b)(3)'s predominance requirement is even more demanding than Rule 23(a)."[146] Citing its opinions mandating a rigorous review for certification, the Court in *Comcast* reiterated that the certification analysis "will frequently entail 'overlap with the merits of the

---

[141] FED. R. CIV. P. 23(b)(3).

[142] *Mullens v. Treasure Chest Casino, LLC*, 186 F.3d 620, 626 (5th Cir. 1999).

[143] *Ahmad v. Old Republic Nat. Title Ins. Co.*, 690 F.3d 698, 703–04 (5th Cir. 2012).

[144] *Comcast*, 133 S. Ct. at 1432.

[145] *Unger*, 401 F.3d at 320 (quoting *Amchem,* 521 U.S. at 623–24).

[146] *Comcast*, 133 S. Ct. at 1432 (citing *Amchem,* 521 U.S. at 623-24).

plaintiff's underlying claim,'" as it "'generally involves considerations that are enmeshed in the factual and legal issues comprising the plaintiff's cause of action.'"[147]

Before applying this analytical framework to the facts at hand, the Court addresses Lead Plaintiff's argument that its certification motion is not subject to *Comcast's* exacting standard for predominance under Rule 23(b)(3). Specifically, the Plan argues that Defendants' reliance upon *Comcast* "is wholly misplaced"due to the distinctions between the legal and factual issues involved in *Comcast* and those at hand.[148] True, *Comcast* involved a different set of facts and legal claims than those involved in this case, and ultimately turned on the antitrust plaintiffs' failure to present a damages model, tied to their theory of liability, which would, in turn, allow a court to calculate class members' damages via a common methodology.[149] Nonetheless, by relying upon these distinctions, the Plan ignores the much more basic lesson of *Comcast* which is undiminished by *Comcast's* factual dissimilarities with this case: that plaintiffs seeking certification must produce quality evidence for each Rule 23 element—period. The Supreme Court has announced a clear directive to plaintiffs seeking class certification—in any type of case—that they will face a "rigorous analysis" by the federal courts,[150] will not be afforded favorable presumptions from the pleadings or otherwise, and must be prepared to prove *with facts*—and by a preponderance of the evidence— the requirements of Rule

---

[147] *Id.* (quoting *Wal-Mart*, 131 S.Ct. at 2551; *Falcon*, 102 S,Ct. at 2364), *accord Funeral Consumer's Alliance*, 695 F.3d at 346.

[148] Pl.'s Reply 7-8.

[149] *Comcast*, 133 S. Ct. at 1430-35.

[150] *Falcon*, 457 U.S. at 161; *see also Amchem*, 521 U.S. at 615 (stating the Rule 23(b)(3) requirements demand a "close look").

23.[151] As explained below, this is where Lead Plaintiff falls short.

### 2.    Lead Plaintiff Fails to Submit Any Evidence Demonstrating Predominance

To begin, the Plan relies largely upon its briefing—as opposed to actual proof—to satisfy its burden to show predominance under Rule 23(b)(3). As discussed before, the only real evidence submitted by Lead Plaintiff in support of its certification motion consists of the roughly two pages of text in the Saville Declaration and a four-page submission reflecting daily trading volume for common shares of Kosmos between May 11, 2011 and January 1, 2012.[152] But Saville's perfunctory Declaration, discussed in detail above, if anything, is directed toward the adequacy issue. And the trading volume sheet merely shows the volume and price of Kosmos's stock following the IPO—facts seemingly undisputed by Defendants. Even assuming these documents are somehow pertinent to the issue of predominance, the Plan never once cites to them (or any evidence for that matter) in arguing that predominance under Rule 23(b)(3) has been satisfied.[153]

That Lead Plaintiff's submissions are akin to no evidence at all, under *Comcast*, ought to end the Court's predominance inquiry here. Indeed, the Plan makes no effort to argue that its "proof" demonstrates predominance. Instead, its position appears to be that such proof is unnecessary. In essence, the Plan asks the Court to *presume* that the proposed class is certifiable simply because of

---

[151] *Comcast*, 133 S. Ct. at 1432 (citing *Wal-Mart*, 131 S. Ct. at 2551-2552).

[152] The Plan's Appendix also includes the eighty-eight page firm resume for Robbins Geller and a one page declaration from Robbins Geller's lead attorney in this case, neither of which is even arguably relevant to the issue of predominance.

[153] *See* Pl.'s Mot. 12-13.

the securities law provisions pursuant to which this case was filed.[154] Relying on this ill-founded assumption, the Plan assures the Court that "common proof regarding [the essential issues in this case] *will be* offered on a uniform, Class-wide basis."[155]

While it is true that courts have, at times, noted that cases brought pursuant to §§ 11 and 12 of the 1933 Act are "especially amenable" to class certification and resolution,[156] "it does not follow" from such isolated statements "that a court should relax its certification analysis, or presume a requirement for certification is met, merely because a plaintiff's claims fall within [the same] substantive categor[y]."[157] Simply put, none of the cases (or isolated quotes) cited by Lead Plaintiff support the proposition that plaintiffs who file suit under §§ 11 and 12 of the 1933 Act are excused from their Rule 23 evidentiary obligations.

For that reason, Lead Plaintiff's attempt to show predominance falls short of its mark. As discussed, the Plan offers no quality proof on predominance. Moreover, its failure cannot be cured by the Plan's prediction that common proof *will be* offered at a later stage in the proceedings. While the nature of the proof to be offered at trial is a relevant consideration for the Court at certification, "[i]t is incorrect to state that a plaintiff need only demonstrate an 'intention' to try the case in a

---

[154] *Id.* ("[P]redominance generally exists where a plaintiff alleges Securities Act violations by defendants on behalf of an investor class. . . . Courts and commentators alike have recognized that, for Securities Act claims like those asserted here, a court can usually find that common factual and legal issues will predominate.") (quotes and internal citations omitted).

[155] *Id.* at 13 (emphasis added).

[156] *In re IndyMac Motrgage-Backed Securities Securities Litigation,* 286 F.R.D. 226, 232 n.40 (S.D.N.Y. 2012).

[157] *In re Hydrogen Peroxide Antitrust Litig.,* 552 F3d 305, 322 (3d Cir. 2009).

manner that satisfies the predominance requirement."[158] The Plan outlines the elements of its claims and the defenses at issue, and generically asserts that such issues "will be" established through common proof or are "subject to generalized proof."[159] Even when directly questioned by the Court at the certification hearing as to how the Plan satisfied its preponderance of the evidence burden on the predominance and superiority elements, Lead Plaintiff's counsel could point to nothing concrete, opting instead to focus on counsel's own view of the shortcomings of the Defendants' evidence stating that "they are just trying to make it more complicated than it is."[160] This is simply not enough under *Wal-Mart* and *Comcast*. Without evidence or facts to support Rule 23(b)(3)'s predominance requirement, the Plan cannot satisfy its burden to show that certification is proper.

> 3.     Defendants' Unrebutted Evidence of Investor Knowledge Shows Individual Issues Predominate

Defendants also contest predominance as it relates to the specific issue of investor knowledge.[161] Defendants urge that their evidence—specifically, the Expert Report of Dr. Glenn Hubbard—shows that potential class members, at the time they each acquired Kosmos's stock, had varying levels of information relevant to the alleged misstatements and omissions in the Registration Statement, precluding a finding of predominance on the essential issue of investor knowledge.[162] Rather than offer any counter-evidence in response, Lead Plaintiff emphasizes in its reply brief that

---

[158] *Id.*

[159] Pl.'s Mot. 13-14..

[160] Cert. Hrg. Tr. at  65-66, 68-71

[161] Defs.' Resp. 9.

[162] Defs.' Resp. 10-11(citing Hubbard Declaration ¶ 26).

investor knowledge is an affirmative defense and argues that Defendants "have not even attempted to introduce" evidence showing that different members of the proposed class knew different things at the time of purchase.[163] As before, Lead Plaintiff relies upon inapposite legal authority unaccompanied evidentiary support and, in so doing, detracts from its position.

Because of its potential to defeat liability, investor knowledge is a relevant consideration during class certification.[164] Under the investor knowledge defense, claims brought pursuant to § 11 of the 1933 Act "will not succeed where a defendant shows that 'the plaintiff knew of the untruth or omission at the time of his or her acquisition of the security.'"[165] Defendants, of course, bear the burden of proof on this affirmative defense and, as such, must submit evidence showing the existence of individual investor knowledge sufficient to preclude a finding by the Court that "common liability issues predominate over individual knowledge issues."[166] This proof need not be at the level required to prove the affirmative defense on the *merits* but must be adequate to satisfy the court at the *certification* stage that "individual knowledge inquiries might be necessary."[167]

Here, Defendants present evidence suggesting that individual knowledge inquiries will be

---

[163] Pl.'s Reply 6-7.

[164] *Turnbow v. Life Partners, Inc.*, Civil Action No. 3:11-cv-1030-M, 2013 WL 3479884 at *15 (N.D. Tex. July 9, 2013) (citing *Gene And Gene LLC v. BioPay LLC*, 541 F.3d 318, 327 (5th Cir. 2008)).

[165] *Indymac*, 286 F.R.D. at 237. To make the analysis less complicated, the Court discusses investor knowledge in relation to Lead Plaintiff's claim under § 11 of the 1933 Act, "because Section 12 and 15 claims are essentially derivative of Section 11 claims." *New Jersey Carpenters Health Fund v. Rali Series 2006-Q01 Trust*, 477 Fed. Appx. 809, 812 (2d Cir. 2012).

[166] *New Jersey Carpenters*, 477 Fed. Appx. at 813; *see also Indymac*, 286 F.R.D. at 238 ("[D]efendants must produce evidence that certain class members had differing levels of knowledge regarding the misleading nature of the statements or omissions when they invested sufficient to outweigh common issues.").

[167] *Id.*

necessary in this case. Specifically, Defendants submit an un-refuted Expert Report in which Dr. Hubbard, Professor of Economics at Columbia University, concludes (among other things) that "[t]he disclosure of information about production issues at the Jubilee field following Kosmos' IPO did not cause any declines in Kosmos' stock price during the alleged class period."[168] Dr. Hubbard reaches this conclusion after conducting a thorough event study, which he cross-checks with two additional analyses, all of which primarily goes to the issue of damages.[169]

Of particular importance to the discussion here—whether investors knew misstatements were false—Dr. Hubbard's Report identifies fourteen dates, all falling within the putative class period, "on which there were (i) conference calls or press releases issued by Kosmos [and/or its drilling partners] concerning negative news about Jubilee Field's production, or (ii) 'new' negative news about production at the field from news sources other than" Kosmos and its drilling partners.[170] These different pieces of "new" information—that is, information released after the IPO (the start of the class period)—create at least fourteen separate opportunities during the putative class period—ranging from May 2011 to December 2012—for potential class members to have acquired varying levels of knowledge regarding the Registration Statement's false and misleading statements.

---

[168] Defs.' Resp. 14 (citing Hubbard Declaration ¶ 34).

[169] Though Dr. Hubbard's main conclusions are not key to the Court's analysis on this particular predominance issue, it is worth noting that the Report and the event study contained therein (which, as noted, is un-refuted by Lead Plaintiff) does not object to) satisfy the reliability standards of *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993). An event study is a reliable "method increasingly recognized by courts and mandated by some of them . . . used by financial economists as a tool to measure the effect on market prices from all types of new information relevant to a company's equity valuation.'" *Enron Corp. Secs.*, 529 F. Supp. at 720 (internal citations omitted). "Numerous courts have held that an event study is a reliable method for determining . . . the market's responsiveness to certain events or information." *In re Xerox Corp. Sec. Litig.*, 746 F. Supp. 2d 402, 408 (D. Conn. 2010) (internal brackets and citations omitted); *see also In re Diamond Foods, Inc.*, 295 F.R.D. 240, 251 (N.D. Cal. Cal. 2013).

[170] Hubbard Declaration ¶ 26.

But the potential for creating varying levels of investor knowledge by virtue of the fourteen new disclosures is not discerned simply by breaking the putative class into fourteen different groups—based on their respective dates of acquisition—and deciding whether the "new" information is sufficient to ascribe knowledge of the production problems to each of the sub-classes. Rather, as Defendants point out, some investors within the putative class may or may not have been aware of this publically-available information based on their varying levels of due diligence, thus creating the potential for additional layers of disparate knowledge beyond the fourteen. Likewise, given the "thousands" of potential investors, the greater the likelihood that the class members differed in their level of sophistication, and thus, in their ability to glean from the newly-disclosed information that Defendants were not being truthful about oil production levels.[171] In short, while the "new" pieces of information identified by Dr. Hubbard may not rise to the level of demonstrating that the Defendants will succeed on the merits of their affirmative defense, it is certainly more than adequate to show that "individual knowledge inquiries might be necessary."[172]

Even the Plan's own allegations show that prospective class members who acquired Kosmos' stock during the class period may have had varying levels of knowledge in accord with Hubbard's opinion. Specifically, the Consolidated Complaint alleges that in "the beginning of 3Q 2011, Kosmos's partners revealed that oil production from Jubilee" was below the Registration Statement's projection numbers, that Kosmos made similar disclosures on August 11, 2011, and that "Kosmos

---

[171] Pl.'s Mot. 7; *see also New Jersey Carpenters*, 477 Fed. Appx. at 813 (citing *Amchem*, 521 U.S. at 623 while noting the significance of the fact that the proposed class definition was "cumbersome"); *In re Initial Pub. Offering Sec. Litig.*, 471 F.3d 24, 43 (2d Cir. 2007) (finding significant, in concluding that investor knowledge was predominantly an individual issue, the fact that the proposed class was "in the thousands).

[172] *New Jersey Carpenters*, 477 Fed. Appx. at 813.

continued to report disappointing production numbers with its third quarter earnings performance."[173]

As mentioned, Lead Plaintiff does not counter with any evidence of its own. Nor does it object to the Expert Report offered by Defendants, raise any issues with its reliability, or otherwise address (much less dispute) the "new" information Dr. Hubbard discusses therein. Instead, Lead Plaintiff quickly dismisses Defendants' contention here by emphasizing that investor knowledge is an affirmative defense. But as discussed, affirmative defenses such as investor knowledge are clearly relevant to the predominance analysis.[174] And while courts have been reluctant to deny certification based on the availability of affirmative defenses where the evidence otherwise demonstrates predominance,[175] that is not an issue in this case because, as discussed, Lead Plaintiff has presented *zero* evidence showing that class-wide issues predominate.

In sum, the Court finds that Lead Plaintiff has failed to meet its burden of showing that common issues of fact and law predominate over the individual issues in this case. While Defendants offered a 107-page Expert Report demonstrating the need for individual inquiries into investor knowledge, Lead Plaintiff offered no proof from which to draw an inference that individual inquiries may not be required if the Court were to certify this putative class that is likely to number in the thousands. Since Lead Plaintiff ignored the burden placed on it by *Comcast* and related cases, the

---

[173] Compl. ¶¶ 43-45.

[174] *See Gene And Gene*, 541 F.3d at 327 ("We have noted that the 'predominance of individual issues necessary to decide an affirmative defense may preclude class certification.'") (quoting *In re Monumental Life Ins. Co.*, 365 F.3d 408, 420 (5th Cir.2004)).

[175] 2 William B. Rubenstein & Herbert B. Newberg, *Newberg on Class Actions* § 4.55 (5th ed. 2011) (citing *Enron Corp. Securities,* 529 F. Supp. 2d at 737) (other citations omitted).

Court must deny certification for failure to show predominance under Rule 23(b)(3).

## V.

## CONCLUSION

For the above reasons, the Court **DENIES** Lead Plaintiff's Motion to Certify Class (doc. 119).

**SO ORDERED.**

**DATED: March 19, 2014**.


_____
JANE J. BOYLE
UNITED STATES DISTRICT JUDGE

41